[Crim. No. 19663. July 22, 1977.]

In re THIERRY S., a Person Coming Under the Juvenile Court Law.
DONALD D. KING, as Chief Probation Officer, etc.,
Plaintiff and Respondent, v.
THIERRY S., Defendant and Appellant.

## COUNSEL

Grundell, Smith & Farmer, Duenow, Burke & Smith, David C. Fitzpatrick, Christopher A. Helenius and Harry E. Woolpert for Defendant and Appellant.

Alden J. Fulkerson, Keith C. Monroe and Stephan G. Saleson as Amici Curiae on behalf of Defendant and Appellant.

Evelle J. Younger, Attorney General, Jack R. Winkler, Chief Assistant Attorney General, S. Clark Moore, Assistant Attorney General, James H. Kline and Kathleen M. Crain, Deputy Attorneys General, for Plaintiff and Respondent.

Bion M. Gregory and James L. Ashford as Amici Curiae on behalf of Plaintiff and Respondent.

## OPINION

**WRIGHT, J.**\*—Thierry S. was declared a ward of the juvenile court after a finding was made that he was a person described in Welfare and

---

*Retired Chief Justice of California sitting under assignment by the Chairman of the Judicial Council.

Institutions Code section 602.[1] He appeals from the ensuing judgment (a dispositional order granting probation) and asserts on both statutory interpretation and constitutional grounds that his arrest without a warrant for an alleged misdemeanor was illegal because the offense was not committed in the presence of the arresting officer. He argues that evidence obtained as a result of such arrest and custody which followed was tainted and should have been suppressed by the juvenile court.

In light of applicable rules of statutory interpretation, we agree with the minor's statutory contentions and conclude that a warrant is required before a minor may be arrested or taken into temporary custody based on the alleged commission of a misdemeanor outside the presence of the arresting officer. Lack of compliance with the warrant requirement in the present case tainted evidence essential to the wardship finding and, accordingly, we reverse the judgment.[2]

An extended recitation of the facts in this case is not essential to our resolution of the central issue before us. Although there is considerable disagreement over the necessity of obtaining a warrant before taking a juvenile into custody under circumstances such as those in the present case, the People have never disputed the minor's assertion that if he was taken into custody illegally the evidence relied upon by the juvenile court was tainted by that initial illegality. Consequently, we summarize only the most basic facts.

Deputy Sheriff Bolts was dispatched to a local schoolyard in response to a citizen's telephone call. When he arrived he saw the minor and another juvenile seated on the ground, their legs bound by a rope. An adult approached Deputy Bolts and indicated that he had detained the two boys after he had observed them standing near the broken window of a schoolroom which had apparently been vandalized only a short time

[1]Section 602 provides in relevant part: "Any person who is under the age of 18 years when he violates any law of this state or of the United States or any ordinance of any city or county of this state defining crime . . . is within the jurisdiction of the juvenile court, which may adjudge such person to be a ward of the court."

Unless otherwise specified, all statutory references are to sections of the Welfare and Institutions Code.

[2]Because we reverse the judgment on a statutory basis we do not reach the further contention that the warrantless arrest was constitutionally impermissible on equal protection grounds. (See, however, *People* v. *Olivas* (1976) 17 Cal.3d 236, 245-251 [131 Cal.Rptr. 55, 551 P.2d 375].)

before his arrival. Based on the representation of the citizen-informant and an inspection of the damaged schoolroom, Bolts concluded that there was probable cause to believe that the juveniles were responsible for the damage and that they therefore fell within section 602 as minors who had violated the law defining misdemeanor vandalism (Pen. Code, § 594, subd. (c)). He informed the boys that they were under arrest and transported them to a local detention facility from which they were ultimately released to the custody of their parents. At about the time of their release, Bolts observed certain physical evidence which later connected the boys with vandalism of a number of railroad signal boxes and produced other evidence relied upon by the juvenile court in reaching its section 602 finding. The finding is based solely on evidence of the railroad vandalism and no further action was taken in regard to the schoolroom incident.[3]

■ The minor relies on section 625.1 as imposing by negative implication a requirement that a warrant must be obtained before a peace officer can take a juvenile into temporary custody based on the alleged commission of a misdemeanor outside of the arresting officer's presence.[4] The People, on the other hand, argue that section 625, subdivision (a) rather than section 625.1 controls in such situations and further contend that section 625 expressly authorizes peace officers to take juveniles into "temporary custody" without a warrant for violation of a criminal law as long as any such arrest is based upon reasonable cause.[5] The minor, in response, does not dispute that section controlled

---

[3] The People suggest, as an additional ground for upholding the judgment, that the custody of the boys was a citizen's arrest to which Deputy Bolts simply provided assistance. (Pen. Code, §§ 837, 839.) That theory lacks merit for two reasons. First, such a justification was never put forth by the People in the trial court. Second, even if such a theory had been raised, Bolts testified that he and no other person placed the boys under arrest for an offense not committed in his presence.

[4] Section 625.1 provides: "A peace officer may, without a warrant, take a minor under the age of 18 into temporary custody as a person described in Section 602:
(a) Whenever the officer has reasonable cause to believe that the minor has committed a public offense *in his presence.*
(b) When the minor has committed a felony, although not in the officer's presence.
(c) Whenever the officer has reasonable cause to believe that the minor has committed a felony, whether or not a felony has in fact been committed.
(d) Whenever the minor has been involved in a traffic accident and the officer has reasonable cause to believe that the minor had been driving while under the influence of intoxicating liquor or under the combined influence of intoxicating liquor and any drug." (Italics added.)

[5] The People argue that at the time that the minor was taken into custody in 1975 section 625, subdivision (a) provided: "A peace officer may, without a warrant, take into

the taking of minors into custody pursuant to section 602 prior to the enactment of section 625.1. He argues, however, that when section 625.1 was enacted in 1971 it took precedence over section 625 insofar as arrests pursuant to section 602 were concerned. Resolution of these conflicting claims necessitates a review of the statutory history of both section 625 and section 625.1 and also involves the application of certain rules of statutory interpretation including those set forth in Government Code section 9605.[6]

At common law it was the general rule that a warrant was required for a misdemeanor arrest unless the offense amounted to a breach of the peace and was committed in the presence of the arresting officer. (5 Am.Jur.2d, Arrest, § 28, p. 718; 1 Torcia, Wharton's Criminal Procedure (12th ed. 1974) Arrest, § 63, p. 168; Comment, *Arrest With and Without a Warrant* (1927) 75 U.Pa.L.Rev. 485-486.) The warrant requirement was designed as a protection against the abuses of arbitrary arrests and continues to serve that purpose today. As society became increasingly complex and personal mobility increased, however, the need for public security resulted in the development of statutes expanding the authority of peace officers to undertake misdemeanor arrests. In California the

---

temporary custody a minor: (a) Who is under the age of 18 years when such officer has reasonable cause for believing that such minor is a person described in Sections 600, 601, or *602*, . . ." (Stats. 1971, ch. 1748, § 69, italics added.)

The foregoing version of the statute is that which appeared in the unofficial codes following the 1971 session of the Legislature and which was retained in those codes until the statute was again amended in 1976. (See Deering's Ann. Welf. & Inst. Code, § 625, subd. (a) (1976 pocket supp.) p. 56; West's Ann. Welf. & Inst. Code, § 625, subd. (a) (1972 ed.) p. 145.) As we describe hereinafter, there is some dispute over whether this version of the statute was that which became operative on the effective date of the Statutes of 1971.

[6]Before proceeding further with our analysis, we must first clarify certain terminology which we utilize in the remainder of this opinion. Neither section 625 nor section 625.1 refer to the term "arrest." (Cf. Pen. Code, § 836.) Instead, both sections use the phrase "take into temporary custody" to describe the procedure employed by peace officers acting pursuant to those sections to detain juveniles believed to have violated a criminal law. When an individual, be he adult or juvenile, has had his personal liberty restrained by a peace officer acting on the belief that the individual has violated a criminal law, there is no meaningful difference between characterization of that detention as an "arrest" or "temporary custody." (Cf. *People* v. *Olivas, supra,* 17 Cal.3d 236, 244-245.) Furthermore, the Penal Code itself defines arrest as "taking a person into custody, in a case and in the manner authorized by law." (Pen. Code, § 834.) In the present case Deputy Bolts testified that after he took the two boys into custody he informed them that "they were under arrest." As "temporary custody" and "arrest" constitute essentially identical procedures we use those terms interchangeably and attach no particular significance to the use of either one.

breach of the peace requirement was eliminated and officers are now authorized to make misdemeanor arrests without a warrant as long as the arresting officer has reasonable cause to believe that such an offense has been committed in his presence. (Pen. Code, § 836.)

Prior to 1960, Penal Code section 836 provided the only statutory standard for misdemeanor arrests in either adult or juvenile contexts. In that year the Governor's Special Study Commission on Juvenile Justice issued a report on the juvenile court law, culminating a three-year comprehensive review of that subject. The commission's report contained findings and proposed a large number of statutory changes designed to make the juvenile court law, which had gone without basic revision since its enactment in 1915, more responsive to the needs of a modern and more complex society. One recommendation was the enactment of a provision in the Welfare and Institutions Code specifically authorizing warrantless juvenile misdemeanor arrests if based on reasonable cause to believe that a minor had broken any state or federal law or local ordinance. (Rep. of the Governor's Special Study Com. on Juvenile Justice (1960) pt. I, pp. 42-43, 65 (hereinafter, Report).)

In support of its recommendation the commission noted that under the then existing state of the law there was little uniformity in the arrest procedures used by various law enforcement agencies throughout the state. Its research revealed that only a few agencies generally complied with the warrant requirement of Penal Code section 836 when arresting minors, while most police and sheriff's departments simply took juveniles into custody ignoring the fact that the misdemeanor had not been committed in the presence of the arresting officer. Other departments commonly utilized the premise that the minor was not receiving proper parental control or was in danger of leading "an idle, dissolute, lewd, or immoral life," (former § 700, subds. (b), (k), enacted Stats. 1937, ch. 369, repealed Stats. 1961, ch. 1616, § 1) as grounds for an arrest. Some agencies even charged such minors with felonies because of concern over the possibility of false arrest suits. (Report, pt. I, p. 43, pt. II, p. 96.) In view of the foregoing practices the commission concluded that warrantless misdemeanor juvenile arrests based solely on probable cause, i.e., without the "in the presence of the arresting officer" requirement of Penal Code section 836, should be expressly authorized by statute. In addition, because a minor falls within the jurisdiction of the juvenile court whenever he violates any law or ordinance defining

crime (§ 602), the commission further concluded that introduction of a warrant requirement by inclusion of an "in the presence" requirement in the new provision would serve no useful purpose.

The result of the commission's recommendation was the enactment of section 625, subdivision (a) which in relevant part then provided as it does now that a peace officer may, without a warrant, take a minor into temporary custody when the officer "has reasonable cause for believing that such minor is a person described in Sections 600, 601, or *602, . . .*" (Stats. 1961, ch. 1616, § 2, italics added; see fn. 4, *ante.*) Our concern is with the statute's reference to section 602, for it is that provision which confers authority to arrest a juvenile based on the alleged violation of a criminal law. (See fn. 1, *ante.*) No relevant changes were made in section 625 until 1971. In that year a sequence of events occurred involving the amendment of section 625 and the enactment of section 625.1 which gives rise to the dispute over the validity of the arrest in the present case.

Three bills affecting the right of peace officers to undertake misdemeanor juvenile arrests pursuant to section 625 were enacted into statutes during the 1971 session of the Legislature. Two of these bills, Assembly Bill No. 910 (A.B. 910) and Assembly Bill No. 911 (A.B. 911), were concerned solely with the question of juvenile arrests, while the third, Assembly Bill No. 2887 (A.B. 2887), was an omnibus measure which, with a few exceptions, lowered the age of majority from 21 to 18 years by amending a broad range of statutes. One of the many statutes amended by A.B. 2887 to lower an age reference was section 625. A.B. 911 was also designed to amend section 625 but, as we discuss hereinafter, despite the fact that it was enacted and chaptered in the Statutes of 1971, the relationship between A.B. 911 and A.B. 2887 was such that A.B. 911 never acquired the force of law and thus section 625 was never amended thereby. A.B. 910 enacted section 625.1 which, as we have seen, established a stricter standard for misdemeanor juvenile arrests by imposing the "in the presence of the arresting officer" requirement for all warrantless arrests with exceptions not here pertinent. The chaptering sequence of these three bills, and in particular that of A.B. 911 and A.B. 2887 constitutes the central factor in the statutory interpretation analysis involved in this case.

When they were first introduced into the Assembly, only one of the three bills in question, A.B. 910, affected section 625. Among other

things, A.B. 910 proposed to amend section 625 by adding language which would have had the effect of prohibiting peace officers from making warrantless arrests of juveniles for alleged misdemeanor violations unless the offenses were committed in the presence of the arresting officers.[7] A.B. 910 and A.B. 911 were later completely redrafted in the Senate to propose a two-pronged statutory scheme for temporary juvenile detentions. First, as redrafted A.B. 910 proposed enactment of a new section 625.1 which would be exclusively concerned with standards for juvenile arrests based on alleged violations of any laws defining crime. (See § 602.) Second, A.B. 911 as redrafted proposed to amend section 625, subdivision (a), contingent on the previous enactment of section 625.1, by deletion of the reference to section 602. The effect of the redrafted versions of A.B. 910 and A.B. 911 would have been that section 625 would thereafter have controlled only juvenile detentions pursuant to sections 600 or 601, while new section 625.1 would have been the sole authorization in the Welfare and Institutions Code for arrests pursuant to section 602—criminal law violations. As we have already noted, the significant feature of new section 625.1 was that it imposed an "in the presence of the arresting officer" standard in misdemeanor cases and thus, unlike section 625, established a warrant requirement when that standard is not met.

At the time that A.B. 910 and A.B. 911 were undergoing major revision in the Senate, A.B. 2887 contained no provision affecting section 625. Because subdivision (c) of section 625 contained a reference to the age of 21 years, it was necessary to provide for the reduction of that reference to 18 years. As a result, A.B. 2887 was amended by adding a new provision proposing the necessary change in section 625.[8] In order to accommodate the two different amendments to section 625 proposed by A.B. 911 and A.B. 2887, when A.B. 910 and A.B. 911 were redrafted by the Senate a procedure referred to as "double-jointing" took place in regard to A.B. 911. Explication of this term requires a brief summary of the process whereby a bill becomes an operative statute.

---

[7] The relevant proposed language read: "For purposes of subdivision (a), reasonable cause for believing that a minor is a person described in Section 602 who has committed a misdemeanor shall be based upon commission of such an offense in the presence of the peace officer detaining the minor." (A.B. 910, as introduced Mar. 11, 1971.)

[8] The sole amendment of section 625 as proposed by A.B. 2887 is indicated as follows: "A peace officer may, without a warrant, take into temporary custody a minor: . . . (c) Who is under the age of 21 *18* years and who is found in any street or public place suffering from any sickness or injury which requires care, medical treatment, hospitalization, or other remedial care." (A.B. 2887, § 69, as amended in the Sen. Nov. 2, 1971.)

After a single version of a bill has been passed by both houses of the Legislature, it can be enacted into a statute in one of three ways. First, the Governor may sign it within certain time limits set forth in the Constitution. Second, the Governor may veto the bill and return it to the Legislature which may in turn enact the bill into a statute by a two-thirds vote in both houses. Finally, if the Governor fails to take any action on the bill within the constitutional time limits, it automatically becomes a statute. (Cal. Const., art. IV, § 10, subd. (a).)

At any one session of the Legislature more than one bill affecting a particular code section or uncodified law may be enacted into a statute. When a conflict is presented by two or more of such recently enacted statutes it is necessary to provide a procedure to determine which of the conflicting statutes will take precedence. The Constitution itself provides no such mechanism and, therefore, the Legislature consistent with pre-existing judicial authority has provided for rules controlling such situations by enacting Government Code section 9605.[9]

■ The second paragraph of Government Code section 9605 establishes the rule that when two or more bills enacted at the same session of the Legislature conflict, the statute which is enacted last prevails. When as in the present case two conflicting bills are signed by the Governor during the same session of the Legislature, the bill signed last is the one which takes precedence, for a bill is not *enacted* into a

---

[9]Government Code section 9605 provides: "Where a section or part of a statute is amended, it is not to be considered as having been repealed and reenacted in the amended form. The portions which are not altered are to be considered as having been the law from the time when they were enacted; the new provisions are to be considered as having been enacted at the time of the amendment; and the omitted portions are to be considered as having been repealed at the time of the amendment. When the same section or part of a statute is amended by two or more acts enacted at the same session, any portion of an earlier one of such successive acts which is omitted from a subsequent act shall be deemed to have been omitted deliberately and any portion of a statute omitted by an earlier act which is restored in a subsequent act shall be deemed to have been restored deliberately.

"In the absence of any express provision to the contrary in the statute which is enacted last, it shall be conclusively presumed that the statute which is enacted last is intended to prevail over statutes which are enacted earlier at the same session and, in the absence of any express provision to the contrary in the statute which has a higher chapter number, it shall be presumed that a statute which has a higher chapter number was intended by the Legislature to prevail over a statute which is enacted at the same session but has a lower chapter number.

"For the purposes of this section, every statute of an even-numbered year of a two-year regular session of the Legislature is deemed to bear a higher chapter number than any statute enacted in the odd-numbered year of that session."

statute until it has been signed by the Governor and transmitted by him to the Secretary of State. (*Davis* v. *Whidden* (1897) 117 Cal. 618, 622 [49 P. 766]; see Note, *Statutory Construction: Conflicting Acts Passed at the Same Session: Higher Chapter Number Prevails* (1956) 3 UCLA L.Rev. 417, fn. 4.) In recognition of this long established rule, the Legislature has provided in Government Code section 9510 a means whereby the order in which bills have been signed can be routinely ascertained: After the Governor has signed and dated a bill it is deposited in the office of the Secretary of State where it is assigned a consecutive chapter number corresponding to the order in which it was received. The order of receipt is presumed to be the order in which the bill was approved by the Governor[10] and thereafter when two or more statutes enacted at the same session conflict, the highest chaptered statute is presumed to prevail.[11] The "highest chapter number test" has long been the rule in this state and the Governor, the Assembly, the Senate, and the judiciary have consistently relied upon it when acting upon and when interpreting legislation. (*In re McManus* (1954) 123 Cal.App.2d 395, 399-400 [266 P.2d 929].)

■ As a consequence of the highest chapter number rule, the Legislature has developed the procedure known as "double-jointing." In the simplest case of two pending bills affecting the same code section in a conflicting manner,[12] double-jointing consists of drafting an alternative version of the code section in question incorporating the changes proposed by both bills which is then included in at least one of the two bills. In addition to the alternative version of the code section a statement of legislative intent is also added to the bill and it provides that if both bills are enacted and affect the same code section, then the amendments proposed by both bills shall be given effect in the form set

[10]Government Code section 9510 provides: "When the Governor approves a bill, he shall affix his name thereto, with the date of signing, and deposit it in the Office of the Secretary of State, where it becomes the official record. Upon receipt of any such bill, the Secretary of State shall give it a number, to be known as the chapter number. He shall number each bill in the order in which it is received by him, and the order of numbering shall be presumed to be the order in which the bills were approved by the Governor."

[11]Because the Legislature has specified that the statute enacted last is *conclusively* presumed to prevail over earlier statute (Gov. Code, § 9605) but at the same time has not designated the highest chapter number test as a conclusive presumption, we infer that the presumption established by Government Code section 9510 is a rebuttable presumption which can be overcome by evidence that the Governor actually approved bills in a different order than indicated by the chapter numbers. (See Evid. Code, § 602 et seq.)

[12]We deem that any variance in two such bills constitutes a conflict.

forth in the alternative version of the code section. Because the double-jointing provision now before us (see fn. 13 *post*) does not purport to make exception to the highest chapter number rule, however, the double-jointing procedure followed in the instant case would achieve the desired result (incorporation of the changes proposed by both bills) *only* if the statute which is enacted last contains the alternative version of the code section being amended with a relevant declaration of legislative intent. Although the double-jointing procedure took place in the present case it was ineffective because, as we next describe, A.B. 911 and A.B. 2887 were not signed by the Governor in the order contemplated by the Legislature and thus the last-enacted of the two statutes failed to contain the necessary alternative version of section 625.

When A.B. 2887 was amended by the Senate to include a provision affecting section 625, that provision of the bill proposed amendment of only subdivision (c) by providing that the age reference therein would be reduced from 21 to 18 years. It is highly significant that the bill *retained* the reference to section 602 in subdivision (a) of section 625.

As stated earlier, when the Senate redrafted A.B. 911 it used a double-jointing procedure by providing for alternative amendments to section 625. Section 1 of A.B. 911 would have made only one change in section 625, deletion of the reference to section 602 in subdivision (a). Due to the fact that A.B. 2887 proposed an amendment of only subdivision (c) of section 625, an alternative version of the amendment to section 625 was proposed. Section 2 of A.B. 911 incorporated both the change proposed by A.B. 2887 and that proposed by section 1 of A.B. 911. Thus section 2 of A.B. 911 proposed not only that section 625 would be amended to delete the reference to section 602 in subdivision (a), but it also proposed that the age reference in subdivision (c) would be reduced from 21 to 18 years.

In order to specify which of the two versions of the amendment to section 625 contained in A.B. 911 and the one version contained in A.B. 2887 would take precedence in the event that both A.B. 911 and A.B. 2887 were enacted into statutes, a statement of legislative intent was incorporated as section 3 of A.B. 911. In sum that statement provided that if A.B. 911 and A.B. 2887 were both enacted into statutes in a form which would affect section 625, and A.B. 2887 was chaptered before A.B. 911 (in other words, if A.B. 911 was approved by the Governor *after* A.B.

2887), then the amendments proposed by both bills would be given effect in the alternative version of section 625 contained in section 2 of A.B. 911.[13]

Despite the fact that both bills were enacted into statutes the chaptering sequence specified by section 3 of A.B. 911 never occurred because the Governor signed the bills in the *reverse* order from that in which they were received from the Legislature. A.B. 2887 was enrolled and sent to the Governor by the Legislature on November 23 while A.B. 911 was not sent to him until seven days later on November 30. Had the bills been approved in that same order section 3 of A.B. 911 would have taken complete effect and section 625 would have been amended to reflect the changes proposed by both bills. Although both bills were eventually approved by the Governor on December 14,[14] A.B. 911 was signed *before* A.B. 2887.[15]

---

[13]In far from unambiguous language, section 3 of A.B. 911 declared: "It is the intent of the Legislature, if this bill and Assembly Bill No. 2887 are both chaptered and amend Section 625 of the Welfare and Institutions Code, and this bill is chaptered after Assembly Bill No. 2887, that the amendments to Section 625 proposed by both bills be given effect and incorporated in Section 625 in the form set forth in Section 2 of this act. Therefore, *Section 625* of this act shall become operative only if this bill and Assembly Bill No. 2887 are both chaptered, both amend Section 625, and Assembly Bill No. 2887 is chaptered before this bill, in which case Section 1 of this act shall not become operative." (Italics added.)

Although neither of the parties to this appeal nor any of amici have noted the point, we observe that the emphasized portion of the second sentence in section 3 contains an obvious mistake which has been present since Section 3 was first incorporated into A.B. 911 in the Senate. Rather than a reference to "Section *625* of this act," we believe the clear intent of the paragraph is that the reference should have been to "Section *2* of this act." This follows because while A.B. 911 contained several references to "Section 625," the bill itself was composed of only four sections. Thus there exists no "Section 625 *of this act*." In order to avoid this obvious absurdity we construe the reference to "Section 625" which appears at the beginning of the second sentence in section 3 of A.B. 911 as meaning "Section 2." (See *People* v. *King* (1865) 28 Cal. 265, 274-276; *Ex parte Hedley* (1866) 31 Cal. 108, 114; 45 Cal.Jur.2d, Statutes, § 131, p. 638.)

[14]Due to the legislative recess required by article IV, section 3 of the Constitution which began upon adjournment of the Legislature on December 2, 1971, the Governor's approval of the bills on December 14th was within the prescribed time limits for action on enrolled bills.

[15]It has been suggested that the Governor was simply unaware of the effect of signing the two bills in the order he did particularly because A.B. 2887 (the age of majority bill) and two other controversial measures were signed last on December 14 while the other 25 bills also approved on that date were signed in the order of their bill numbers. The possibility of such an oversight is unlikely, however, in view of the fact that the Governor received a routine "Report on Enrolled Bill" from the Legislative Counsel's office in regard to both A.B. 911 and A.B. 2887 specifically stating the effect of signing the bills in either order.

The effect of this reversed order of enactment was that A.B. 911 was chaptered lower (ch. 1730) than A.B. 2887 (ch. 1748) and therefore pursuant to the highest chapter number rule as set forth in Government Code section 9605 and the failure of the terms of the double-jointing provision to make any exception thereto, the version of section 625 contained in A.B. 2887 prevailed over both versions of section 625 contained in A.B. 911. Thus on the effective date of the statutes enacted in the 1971 legislative session, March 4, 1972, the *only* amendment of section 625 which occurred was reduction of the age reference in subdivision (c). The reference to section 602 in subdivision (a) of section 625 was *unaffected* and it remained as it had since that section was first enacted in 1961.

By itself, the reference to section 602 in subdivision (a) of section 625 creates no ambiguity in the statutory scheme for misdemeanor juvenile arrests. An ambiguity appears, however, because section 625.1 (Stats. 1971, ch. 1415; A.B. 910) also became an operative statute for the first time on March 4, 1972, the effective date of the amendment to section 625. Because both section 625 and section 625.1 now purport to provide for section 602 arrest situations, an obvious conflict exists.

It has been suggested that there is in fact no conflict between section 625 and section 625.1 because the enactment of A.B. 911 resulted in an amendment of section 625 by the removal of the section 602 reference contained in subdivision (a) of section 625. Therefore, it is argued, section 625.1 is the sole authority in the Welfare and Institutions Code controlling section 602 arrests. Such an argument ignores the highest chapter number rule by which A.B. 2887 is deemed to have negated the purported intent to remove the section 602 reference contained in subdivision (a) of section 625. It is claimed, however, that the rule, as adopted by the Legislature in Government Code section 9605, is in violation of article IV, section 10 of the Constitution. That section specifies the manner in which the Governor may act on a bill which has been sent to him after passage by both houses of the Legislature.[16]

---

[16]Article IV, section 10, subdivision (a) of the Constitution provides in relevant part: "Each bill passed by the Legislature shall be presented to the Governor. It becomes a statute if it is signed by the Governor. The Governor may veto it by returning it with any objections to the house of origin, which shall enter the objections in the journal and proceed to reconsider it. If each house then passes the bill by rollcall vote entered in the journal, two thirds of the membership concurring, it becomes a statute. A bill presented to the Governor that is not returned within 12 days becomes a statute . . . ." (The

Because that constitutional provision fails to grant to the Governor the authority to control legislation by the order in which he approves such bills, it is urged that the highest chapter number rule is an abridgment of the division of powers set forth in the Constitution.

The foregoing contention is nothing more than a request that we overrule our decision in *Davis* v. *Whidden, supra,* 117 Cal. 618, 622, wherein we held that a bill does not become a statute until it is approved by the Governor, and thus conflicts between statutes enacted at the same legislative session must be resolved by examination of their order of approval by the Governor. We are urged to hold in place of this long-established rule that conflicts between such statutes are to be resolved by examination of the order of their passage by the Legislature. (Compare *People* v. *Mattes* (1947) 396 Ill. 348 [71 N.E.2d 690].)

No persuasive grounds are urged which convince us that the highest chapter number rule violates the division of powers doctrine set forth in the Constitution. It does not necessarily follow that because article IV, section 10 does not expressly grant to the Governor the power to control the order in which legislation may take effect, that such a procedure infringes legislative prerogatives. The separation of powers doctrine is necessarily conditioned by the constitutional provision which manifestly involves the Governor in the legislative process to the extent provided therein. It provides not only how, through the Governor's action or inaction a legislative bill becomes a statute but also, inferentially at least, when enactment occurs. As it provides the Governor with the right to control, within limits, when an enactment occurs, it cannot be denied that he may elect, again within limits, the relative order in which enactments may occur. It appears, moreover, that the Legislature has not sacrificed any control to the Governor, as it retains the power to condition the operation of a statute or a series of statutes on the action the Governor may take in respect thereto. It could have, had it chosen to do so, provided "double jointing" provisions in both A.B. 911 and A.B. 2887 which would have insured the particular result it desired regardless of the order of approval by the Governor because in either case the last enacted statute would have contained an alternative version of section 625. We reaffirm our holding in *Davis* v. *Whidden, supra,* 117 Cal. 618, 622,

---

remainder of the subdivision deals largely with the time limit for action which is in effect near the end of legislative sessions.)

and continue to follow the highest chapter number rule as set forth in Government Code section 9605.

█ As we have previously noted, the significant difference between the two statutes in question is that section 625.1 imposes an "in the presence of the arresting officer" requirement for warrantless juvenile misdemeanor arrests, while section 625 contains no similar limitation. In order to resolve the conflict between these differing arrest provisions we turn to the doctrine of implied repeal. █ When two or more statutes concern the same subject matter and are in irreconcilable conflict the doctrine of implied repeal provides that the most recently enacted statute expresses the will of the Legislature, and thus to the extent of the conflict impliedly repeals the earlier enactment. Repeals by implication, however, are not favored and there is a presumption against operation of the doctrine. (*Cal. Drive-in Restaurant Assn.* v. *Clark* (1943) 22 Cal.2d 287, 292 [140 P.2d 657, 147 A.L.R. 1028].) "They are recognized only when there is no rational basis for harmonizing the two potentially conflicting statutes [citation], and the statutes are 'irreconcilable, clearly repugnant, and so inconsistent that the two cannot have concurrent operation. The courts are bound, if possible, to maintain the integrity of both statutes if the two may stand together.' " (*In re White* (1969) 1 Cal.3d 207, 212 [81 Cal.Rptr. 780, 460 P.2d 980].)

██ Insofar as section 625.1 imposes an "in the presence of the arresting officer" requirement for warrantless juvenile misdemeanor arrests and section 625 contains no such limitation, there is no rational way in which the two statutes may be reconciled. We must, accordingly, ascertain which statute constitutes the later enactment. Section 625.1 was enacted in the 1971 legislative session and became effective on March 4, 1972. Although section 625 as *amended* also became effective on that date, it was amended only as to an unrelated matter. Government Code section 9605 provides for the instant precedence issue: "Where a section or part of a statute is amended, it is not considered as having been repealed and reenacted in the amended form. *The portions which are not altered are to be considered as having been the law from the time when they were enacted.*" (Italics added.) In the present case, the amendment of subdivision (c) in section 625 by the age of majority bill (Stats. 1971, ch. 1748; A.B. 2887) did not, as we have already indicated, alter the reference to section 602 contained in subdivision (a) of the statute. It

therefore follows that subdivision (a) of section 625 dates from 1961 when it was first enacted. (Stats. 1961, ch. 1616, § 2.) Accordingly, insofar as section 625, subdivision (a) conflicts with section 625.1 on the subject of misdemeanor juvenile arrests, the former section was impliedly repealed by enactment of section 625.1 in 1971.[17]

 In view of the foregoing, the arrest of Thierry in 1975 was governed by section 625.1. Because he was arrested without a warrant for the alleged commission of a misdemeanor which had not been committed in the presence of the arresting officer, the arrest was invalid. As a consequence of that illegal arrest the evidence relied upon by the juvenile court was tainted and should have been suppressed. Because there is no other material evidence that the minor came within the provisions of section 602, the finding cannot be supported.

The judgment is reversed.

Tobriner, Acting C. J., Mosk, J., Richardson, J., Sullivan, J.,* and Kaus, J.,† concurred.

[17]Notwithstanding the long and relatively complicated analysis we have engaged in to reach our conclusion one further observation is appropriate. Although it can be argued that we could have reached the same result by simply analyzing the purpose behind section 625.1 and concluding therefrom that the Legislature obviously intended it to supersede the relevant portion of section 625, subdivision (a), having failed to do so only through inadvertence, we have not done so for a very specific reason—in this state the highest chapter number rule and related analyses, when applicable, constitute the exclusive method designated by the Legislature for interpreting legislative intent and resolving conflicts between statutes enacted at the same session. In *People* v. *Williams* (1954) 124 Cal.App.2d 32 [268 P.2d 156], the court disregarded the highest chapter number rule as set forth in *Davis* v. *Whidden, supra*, 117 Cal. 618, 622, concluding that the Legislature failed only through inadvertence to include certain language added to section 859 in a statute enacted at an earlier time in the same session when section 859 was again amended by a second statute a short time later. As a consequence of that conclusion the court reasoned that the statute with the *lower* chapter number should prevail. The reaction of the Legislature to the *Williams* decision was swift and unmistakable. It legislatively mandated, through amendment of Government Code section 9605 in 1955 by addition of the language now contained in the second paragraph of that code section, that the highest chapter number rule *must* be used in resolving conflicts between statutes enacted at different times but during the same session of the Legislature. (See Stats. 1955, ch. 5, § 5; Review of Selected 1955 Code Legislation (Cont.Ed.Bar 1955) § 95, pp. 207-209.) Finally, the highest chapter number rule is more desirable than the *Williams* approach because without such a rule the controlling version

*Retired Associate Justice of the Supreme Court sitting under assignment by the Chairman of the Judicial Council.

†Assigned by the Chairman of the Judicial Council.

CLARK, J.—I concur in the majority opinion insofar as it holds that Assembly Bill No. 911 (A.B. 911) did not take effect to delete the reference to Welfare and Institutions Code section 602 from the provisions of section 625 of that code. (*Ante,* p. 742.) The later enacted Assembly Bill No. 2887 (A.B. 2887) restored the reference to section 602. The case then comes within the express provision of the second part of the second sentence of Government Code section 9605: "When the same section or part of a statute is amended by two or more acts enacted at the same session, any portion of an earlier one of such successive acts which is omitted from a subsequent act shall be deemed to have been omitted deliberately and *any portion of a statute omitted by an earlier act which is restored in a subsequent act shall be deemed to have been restored deliberately.*"[1] (Italics added.)

I further agree with the majority's conclusion that the "double jointing" provision of A.B. 911 cannot be given effect. By its own terms, the "double jointing" provision only became operative if A.B. 911 was chaptered after A.B. 2887 (see *ante,* p. 741, fn. 13), and this did not occur. Thus, as the majority hold, the duly enacted statutes were Welfare and

---

of a code section which is amended by two or more statutes at a single session of the Legislature could never be ascertained without a judicial determination. (See Note, *Statutory Construction: Conflicting Acts Passed at the Same Session: Higher Chapter Number Prevails, supra,* 3 UCLA L.Rev. 417, 418-419.) Thus it is inaccurate to say that we could have more simplistically resolved the instant case by interpreting the Legislature's intent—for application of the highest chapter number rule is what manifests the Legislature's intent in such a case.

[1]Government Code section 9605 provides: "Where a section or part of a statute is amended, it is not to be considered as having been repealed and reenacted in the amended form. The portions which are not altered are to be considered as having been the law from the time when they were enacted; the new provisions are to be considered as having been enacted at the time of the amendment; and the omitted portions are to be considered as having been repealed at the time of the amendment. When the same section or part of a statute is amended by two or more acts enacted at the same session, any portion of an earlier one of such successive acts which is omitted from a subsequent act shall be deemed to have been omitted deliberately and any portion of a statute omitted by an earlier act which is restored in a subsequent act shall be deemed to have been restored deliberately.

"In the absence of any express provision to the contrary in the statute which is enacted last, it shall be conclusively presumed that the statute which is enacted last is intended to prevail over statutes which are enacted earlier at the same session and, in the absence of any express provision to the contrary in the statute which has a higher chapter number, it shall be presumed that a statute which has a higher chapter number was intended by the Legislature to prevail over a statute which is enacted at the same session but has a lower chapter number.

"For the purposes of this section, every statute of an even-numbered year of a two-year regular session of the Legislature is deemed to bear a higher chapter number than any statute enacted in the odd-numbered year of that session."

Institutions Code section 625, as set forth in A.B. 2887[2] and section 625.1 as set forth in Assembly Bill No. 910.[3]

I also agree with the majority's ultimate conclusion that an arrest without a warrant for the alleged commission of a misdemeanor committed outside the presence of the arresting officer is invalid. However, in reaching this conclusion I travel a different path from the majority.

"As we stated in *In re Williamson* (1954) 43 Cal.2d 651, 654 [276 P.2d 593], 'It is the general rule that where the general statute standing alone would include the same matter as the special act, and thus conflict with it, the special act will be considered as an exception to the general statute *whether it was passed before or after such general enactment.*' [Citations.]" (Italics added; *People* v. *Gilbert* (1969) 1 Cal.3d 475, 479 [82 Cal.Rptr. 724, 462 P.2d 580].) This court recently reiterated the principle in *Agricultural Labor Relations Bd.* v. *Superior Court* (1976) 16 Cal.3d 392, 420 [128 Cal.Rptr. 183, 546 P.2d 687], quoting the underscored words. An exception to the general-special rule of construction is made where a contrary legislative intent is clearly expressed. (*Warne* v. *Harkness* (1963) 60 Cal.2d 579, 588 [35 Cal.Rptr. 601, 387 P.2d 377]; *Candlestick Properties, Inc.* v. *San Francisco Bay Conservation etc. Com.* (1970) 11 Cal.App.3d 557, 565 [89 Cal.Rptr. 897].)

The general-special rule of construction finds its clearest application when, as in the instant case, the special provision follows closely upon the general provision. Courts commonly set forth a general proposition

---

[2]Welfare and Institutions Code section 625 as amended by A.B. 2887 provided: "A peace officer may, without a warrant, take into temporary custody a minor: (a) Who is under the age of 18 years when such officer has reasonable cause for believing that such minor is a person described in Sections 600, 601, or *602*, or . . . ." (Italics added.)

Section 602 of that code refers to a minor "who violates any law . . . or any ordinance . . . ."

[3]Welfare and Institutions Code section 625.1 provides: "A peace officer may, without a warrant, take a minor under the age of 18 into temporary custody as a person described in Section 602: [¶] (a) Whenever the officer has reasonable cause to believe that the minor has committed a public offense in his presence. [¶] (b) When the minor has committed a felony, although not in the officer's presence. [¶] (c) Whenever the officer has reasonable cause to believe that the minor has committed a felony, whether or not a felony has in fact been committed. [¶] (d) Whenever the minor has been involved in a traffic accident and the officer has reasonable cause to believe that the minor had been driving while under the influence of intoxicating liquor or under the combined influence of intoxicating liquor and any drug."

and then in succeeding sentences proceed to amplify, modify, explain, qualify or set forth exceptions. Indeed, I did so in the immediately preceding paragraph. There is no reason why the Legislature should not be permitted to do so in consecutively numbered code sections.

It is immaterial whether section 625 or section 625.1 is deemed enacted first. Section 625.1 is obviously the special statute, and it should be given effect.