89 Cal.Rptr.2d 572 (1999)
75 Cal.App.4th 889
Stanley SWENSON, Jr., Plaintiff and Respondent,
v.
COUNTY OF LOS ANGELES, Defendant and Appellant.
No. B118613.
Court of Appeal, Second District, Division Four.
October 18, 1999.
Review Granted January 13, 2000.
*573 Patterson, Ritner, Lockwood, Gartner & Jurich, Clyde Lockwood, Los Angeles, Timothy P. O'Brien; Greines, Martin, Stein & Richland, Martin Stein and Barry M. Wolf, Beverly Hills, for Defendant and Appellant.
Pine & Pine, Norman Pine, Beverly Tillett Pine, Encino; Law Offices of Richard Amerian, Richard Amerian, Sherman Oaks; Law Offices of Michael S. Duberchin and Michael S. Duberchin, Calabasas, for Plaintiff and Respondent.
EPSTEIN, J.
Appellant County of Los Angeles appeals from a judgment under the Fair Employment and Housing Act (Gov.Code, § 12900 et seq.; FEHA).[1] A jury determined that appellant discriminated against respondent Stanley Swenson, Jr., M.D. because of his mental disability. The principal issue is the meaning in FEHA of "mental disability" in the context of employment. Appellant argues the term has the same meaning as it does in the Americans With Disabilities Act (42 U.S.C. § 12101 et seq.; ADA). The trial court refused a proposed jury instruction that was based on the ADA definition of "mental disability." We conclude the trial judge was correct in refusing this instruction because the California definition of "mental disability" is different from the ADA definition. We affirm the judgment.

FACTUAL AND PROCEDURAL SUMMARY
Dr. Swenson was a physician employed by appellant at the Los Angeles County/University of Southern California Medical Center (Medical Center). Dr. Swenson joined the staff of the Medical Center in 1977. For over 15 years, he served as a ward chief, attending physician, and assistant clinical professor of psychiatry and behavioral sciences. Dr. Swenson supervised residents at the Medical Center. He suffers from attention deficit disorder, a learning disability. He also suffers from dyslexia and a disability involving writing and written expression. Despite these lifelong disabilities, Dr. Swenson was able to complete his school, university and professional education. Although his duties at the Medical Center included responsibility for the preparation of written patient records (charting), he was able to discharge that duty by using residents he supervised in the teaching wards to which he was assigned.
In 1992, the Medical Center reorganized its four psychiatric wards. Because of a lack of students seeking such assignments, it designated two of the wards as teaching wards and the other two as non-teaching *574 wards. It assigned Dr. Swenson to a nonteaching ward. Because there were no residents assigned to this ward, Dr. Swenson had sole responsibility for preparation of written charts for his patients. He had difficulty completing this task due to his mental disabilities. He retained an attorney, who wrote to the Medical Center informing it for the first time of Dr. Swenson's disabilities. Dr. Swenson requested several accommodations, including transfer to a vacancy in a teaching ward with residents, a quiet environment so he could better concentrate on preparing the written charts, and the use of dictation services or computer software. No accommodation resulted. Eventually, the Medical Center suspended Dr. Swenson and later terminated his employment.
While still employed by the Medical Center, Dr. Swenson filed suit against his employer. Dr. Swenson could have pursued legal action against the Medical Center under the ADA. Instead, he chose to sue under FEHA. After filing a complaint and receiving a right-to-sue letter from the Department of Fair Employment and Housing, Dr. Swenson commenced this action in August 1994. In it, he alleged discrimination based on mental disability and age.[2]
At trial, the court instructed the jury that "[a]n employee has a mental disability when he has or is regarded by his employer as having any mental disorder or condition which affects one or more major life activities." The trial court refused a jury instruction proposed by the Medical Center that defined disability as "a physical or mental impairment that substantially limits one or more of the major life activities of [an] individual." The jury found that the Medical Center discriminated against Dr. Swenson because of mental disability in the employment actions that it took against him. The jury awarded Dr. Swenson economic damages of $532,000, and $370,000 in non-economic damages. The trial court entered judgment for this amount and awarded Dr. Swenson $268,210 in attorney's fees. The Medical Center filed a timely appeal.

DISCUSSION

I
The Medical Center contends the trial court should have instructed the jury in accordance with the ADA definition of mental disability. It argues that it would have prevailed if the trial court had done so because there was insufficient evidence to support a finding of disability under that standard. Based on the clear text of the statute, we conclude that FEHA imposes a standard different from the ADA standard. The trial court thus properly refused the Medical Center's proposed jury instruction.[3]
In the enactment of FEHA in 1980, the Legislature prohibited employment discrimination "because of ... physical handicap." (Stat. 1980, ch. 992, § 4, p. 3148.) The original statute did not cover employment discrimination based on mental disability. At that time, federal law did not prohibit discrimination in employment based on either physical or mental disability. In 1990, Congress enacted the ADA. (42 U.S.C. § 12101 et seq.) The protection afforded by that law reached further than FEHA. It prohibited discrimination because of "disability" that stemmed from "a physical or mental impairment." (42 U.S.C. § 12102, italics added.) In its next session, the Legislature approved, and the Governor signed, Assembly Bill No. 1077. (Stat.1992, ch. 913.) This comprehensive bill amended several statutes, changing definitions of disability, expanding protections against discrimination because of disability, and altering requirements concerning *575 accommodations of disabilities. With this legislation, the Legislature expanded FEHA so that it includes "mental disability" as well as "physical disability" as bases on which it is "an unlawful employment practice" to discriminate in the "terms, conditions, or privileges of employment." (§ 12940, subd. (a).)
The term "mental disability" is defined in the FEHA provisions against employment discrimination: "`Mental disability' includes any mental or psychological disorder, such as mental retardation, organic brain syndrome, emotional or mental illness, and specific learning disabilities." (§ 12926, subd. (i).) Like the ADA definition, FEHA excludes certain specific conditions, and provides that the unlawful use of controlled substances or other drugs shall not in and of itself constitute a disability. (Ibid.)[4] The FEHA definition contains no express requirement as to the degree of disability that must result from a condition in order to trigger the statutory protection it provides. The existence of a disabling mental conditionunless otherwise excludedqualifies an individual for protection from employment discrimination based on the condition.
Section 12926 is a definitional provision. In a different subdivision of the same section, the Legislature defined "physical disability" in greater detail. That subdivision provides, in pertinent part:
"(k) `Physical disability' includes, but is not limited to, all of the following:
"(1) Having any physiological disease, disorder, condition, cosmetic disfigurement, or anatomical loss that does both of the following:
"(A) Affects one or more of the following body systems: neurological, immunological, musculoskeletal, special sense organs, respiratory, including speech organs, cardiovascular, reproductive, digestive, genitourinary, hemic and lymphatic, skin, and endocrine.
"(B) Limits an individual's ability to participate in major life activities." (§ 12926, subd. (k), italics added.)
This definition of "physical disability" is similar to the ADA definition of "disability," but it does not track the ADA precisely. The ADA offers a single definition of "disability" applicable to both physical and mental disabilities. It defines "disability" as "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such an individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." (42 U.S.C. § 12102(2), italics added.)[5] Thus, under the ADA, an individual is entitled to its protection only if a physical or mental impairment is so serious that it "substantially limits" a major life activity. There is no such requirement in the plain language of the FEHA definitions of "mental disability" or of "physical disability."[6]
The legislative definition does not require that an individual have a qualifying mental disability that "substantially limits" or even "limits" a major life activity. (Pensinger v. Bowsmith, Inc. (1998) 60 *576 Cal.App.4th 709, 721, 70 Cal.Rptr.2d 531.) The Medical Center nonetheless contends that FEHA requires the same showing that the ADA demands. It insists that, despite the plain language of section 12926, subdivision (i), the Legislature intended the statute to include the same requirements as the ADA for both physical and mental disability. The result, it argues, is that the "substantially limits one or more of the major life activities" requirement should be read into FEHA's definition of "mental disability." Rather than focusing on the text of the definition of "mental disability" in section 12926, subdivision (i), the Medical Center looks to another statute defining "disability" (§ 12955.3), which addresses discrimination in housing.[7] It also directs us to extrinsic legislative materials. The Medical Center asks that we look to these sources and then, in effect, redo the Legislature's work by engrafting the "substantially limits one or more of the major life activities" requirement onto the statute. Following well-settled principles of statutory interpretation, we decline to undertake a judicial rewriting of the statute.
"In construing statutes, we must determine and effectuate legislative intent." (Woods v. Young (1991) 53 Cal.3d 315, 323, 279 Cal.Rptr. 613, 807 P.2d 455.) To do so, "we must first turn to the words of the statute itself." (Hartford Fire Ins. Co. v. Macri (1992) 4 Cal.4th 318, 326, 14 Cal.Rptr.2d 813, 842 P.2d 112.) In most cases, the inquiry ends at that point: "If there is no ambiguity in the language of the statute, `then the Legislature is presumed to have meant what it said, and the plain meaning of the language governs.'" (Lennane v. Franchise Tax Bd. (1994) 9 Cal.4th 263, 268, 36 Cal.Rptr.2d 563, 885 P.2d 976, quoting Kizer v. Hanna (1989) 48 Cal.3d 1, 8, 255 Cal.Rptr. 412, 767 P.2d 679.) When a statute is unambiguous, "there is no need for construction, and the court should not indulge in it." (Agnew v. State Bd. of Equalization (1999) 21 Cal.4th 310, 329-330, 87 Cal.Rptr.2d 423, 981 P.2d 52.) We may look beyond the words of the statute and examine extrinsic aids only when a statute is ambiguous. (Hughes v. Board of Architectural Examiners (1998) 17 Cal.4th 763, 776, 72 Cal.Rptr.2d 624, 952 P.2d 641.) "If the plain language of a statute is unambiguous, no court need, or should, go beyond that pure expression of legislative intent." (Kobzoff v. Los Angeles County Harbor/UCLA Medical Center (1998) 19 Cal.4th 851, 861, 80 Cal.Rptr.2d 803, 968 P.2d 514.)
The position of the Medical Center is contrary to the general rule that, even if the Legislature inadvertently omits language, the unambiguous statutory language still controls. (Autoland, Inc. v. Superior Court (1988) 205 Cal.App.3d 857, 860, 252 Cal.Rptr. 662.) The exception is if an absurd result would follow from the plain language. (Ibid.) There is no suggestion in this case that a less rigorous standard for mental disability in the context of employment discrimination would lead to an absurd result. The Legislature provided definitions of mental and physical disability in section 12926 with an express provision that the ADA standard be used only if it would result in "broader protection of the civil rights of individuals with a mental disability or physical disability" or include any disabling conditions not included in FEHA definitions. (§ 12926, subd. (l)).)[8] The fact that the FEHA standard *577 for mental disability is less exacting than the ADA provision is consistent with this express legislative intent.
That the FEHA definition of mental disability is different from the definition of the same term in another unrelated section does not create an ambiguity. To the contrary, the distinction manifests a legislative intent to apply a different definition for employment discrimination. Were we to conclude otherwise, we would have to "`interpret away clear language in favor of an ambiguity that does not exist.'" (Hartford Fire Ins. Co. v. Macri, supra, 4 Cal.4th at p. 326, 14 Cal.Rptr.2d 813, 842 P.2d 112, quoting Campbell v. State Farm Mut. Auto. Ins. Co. (1989) 209 Cal.App.3d 871, 875, 257 Cal.Rptr. 542.) We are not permitted to do so. Because no ambiguity exists, we have no need to consider extrinsic aids. The "pure expression of legislative intent" in the plain language of the provisions of section 12926 resolves the matter. (Kobzoff v. Los Angeles County Harbor/UCLA Medical Center, supra, 19 Cal.4th at p. 861, 80 Cal.Rptr.2d 803, 968 P.2d 514.)
Whether the definition of "mental disability" in section 12926, subdivision (i) means what its plain language says or carries a different meaning discernible by reference to the ADA or other statutes has been the subject of two reported decisions. In Pensinger v. Bowsmith, supra, the court concluded that it was "not at liberty to ignore the plain language of the statute or supplant our judgment for that of the Legislature." (60 Cal.App.4th at p. 722, 70 Cal.Rptr.2d 531.) Pensinger added: "Undoubtedly, the Legislature was aware of the definitions of mental and physical disability included in the ADA because it referred to it repeatedly in [Assembly Bill No. 1077]. [Citation.] Undoubtedly, the Legislature also knew how to amend the FEHA to include a requirement that a mental disability effect must limit a major life activity, if it wished that result." (Ibid., italics added.) We agree with this analysis. The Legislature's repeated use of the ADA definition of disability shows that it was aware of the particulars of that definition. The Legislature's departure from that definition in the employment context demonstrates that the Legislature intended to set a different standard in that context.
Only months after the Fifth District decided Pensinger, Division One of the Fourth District reached a contrary result. In Muller v. Automobile Club of So. California (1998) 61 Cal.App.4th 431, 71 Cal. Rptr.2d 573, the court at the outset agreed with the conclusion that Pensinger reached based on the plain language of the employment disability provision: "The definition of `mental disability' in section 12926 includes, without qualifying language, `emotional or mental illness.' The terms `emotional illness' and `mental illness' can be broadly construed to include myriad temporary mental or psychological disorders that are not truly disabling because they do not impair any of the afflicted person's major life activities." (Id. at p. 441, 71 Cal.Rptr.2d 573.) Yet Muller went on to hold that subdivision (i) "creates an ambiguity" when read in concert with the definition of physical disability in subdivision (k) and other provisions containing definitions of disability. (Ibid.) The court particularly noted section 12955.3, subdivision (a), which pertains to housing discrimination and which reflects the ADA definition of disability for both physical and mental disabilities: "We can think of no good reason why the Legislature would define `mental disability' more broadly in the context of employment discrimination than in the context of housing discrimination." (Ibid.) Because "so many other antidiscrimination statutes" reflect the ADA's definition of mental disability, the court surmised that such use "strongly indicates" *578 that the Legislature also intended the ADA definition to apply in FEHA's employment discrimination statutes. (Ibid.) Muller concluded that the absence of the "substantially limits a major life activity" requirement in subdivision (i) was a "legislative oversight." (Id. at p. 443, fn. 6, 71 Cal.Rptr.2d 573.) It judicially engrafted the additional requirement onto the provision in order to produce uniformity among statutes involving mental disability.
The Muller court's conclusion that the definition of mental disability in the employment context is a legislative oversight, because the ADA definition is used elsewhere in FEHA, is contrary to an accepted rule of statutory construction. The accepted rule is that departure from a definition and the use of a different definition relevant only in one context indicates that the Legislature intended a different definition to apply there. Further, as we have discussed, the Legislature's inclusion of subdivision (l in section 12926 clearly expresses its intent that a definition of mental disability more protective than the ADA standard should apply in employment, with the FEHA definition superseded only if the ADA definition is more protective.
The Medical Center also points to what it describes as a "technical matter" in the definition provision of the housing discrimination portion of FEHA. That statute, section 12955.3, as we have seen, defines "disability" as a physical or mental impairment that "substantially limits one or more of a person's major life activities." This definition reflects the form and substance of the ADA's definition of "disability." (42 U.S.C. § 12102(2).) Although section 12955.3 pertains to housing, the Medical Center argues that this section's definition of mental disability applies throughout FEHA because the opening provision of section 12955.3 states that its definitions apply "[f]or purposes of this part." FEHA comprises Part 2.8 of the Government Code. Therefore, the Medical Center argues, the text of section 12955.3 applies to the entire FEHA, including the provision prohibiting employment discrimination based on mental disability.
We are not persuaded. The employment discrimination provision of FEHA also declares that its definitions apply "[a]s used in this part in connection with unlawful practices ...." (§ 12926, emphasis added.)[9] Of course, section 12926 also is included in part 2.8 of the Government Code. If the Medical Center's approach were correct, it could as readily be argued that the mental disability definition in the employment discrimination provision governs throughout FEHA. The obvious reconciliation of these apparently conflicting provisions is that each applies to its own subject.
"Words must be construed in context, and statutes must be harmonized, both internally and with each other, to the extent possible." (California Mfrs. Assn. v. Public Utilities Com. (1979) 24 Cal.3d 836, 844, 157 Cal.Rptr. 676, 598 P.2d 836.) "Courts should give meaning to every word of a statute if possible, and should avoid a construction making any word surplusage." (Arnett v. Dal Cielo (1996) 14 Cal.4th 4, 22, 56 Cal.Rptr.2d 706, 923 P.2d 1.) Looking to the context of the differing definitions of mental disability in FEHA, we conclude that the Legislature intended to provide one definition for employment discrimination and a different definition for housing discrimination.
Section 12926 includes "mental disability" among a list of terms relevant to the employment context, such as "employee," "employer," "employment agency," and "labor organization." The section also defines several types of discrimination prohibited *579 in employment under terms relevant only to employment under FEHA.[10] On the other hand, section 12955.3 is in Article 2 of FEHA, titled, "Housing Discrimination." It follows section 12955, which outlines a list of unlawful housing practices, and it is one of a series of provisions that either define or elaborate upon terms and requirements in section 12955. The different definitions of mental disability in sections 12926 and 12955.3 are easily harmonized: Section 12926 applies to employment, while the definition in section 12955.3 that reflects the ADA standard applies to housing. This interpretation "makes sense of an apparent inconsistency" (Wells v. Marina City Properties, Inc. (1981) 29 Cal.3d 781, 788, 176 Cal.Rptr. 104, 632 P.2d 217), by harmonizing the mental disability definitions and giving both of them effect without rewriting or disregarding any of their parts. "It is fundamental that legislation should be construed so as to harmonize its various elements without doing violence to its language or spirit." (Ibid.)
The manner in which sections 12926 and 12955.3 were enacted also supports this conclusion. The Legislature adopted the differing definitions of mental disability in separate bills in 1992. It enacted section 12926, subdivision (i) through Assembly Bill No. 1077. (Stat.1992, ch. 913, § 21.3, p. 4306.) Section 12955.3, which uses the ADA standard, was enacted through Senate Bill No. 1234. (Stat.1992, ch. 182, § 10, p. 919.) Senate Bill No. 1234 addressed only discrimination in housing. The subject matter of the bill is clear from its short title: "This act shall be known and may be cited as the California Fair Housing Act of 1992." (Stat.1992, ch. 182, § 1, p. 912.) Because of the subject matter of Senate Bill No. 1234, we have no doubt that the Legislature intended section 12955.3 to apply only to housing.
Finally, even if we were to agree that the definition in section 12955.3 applies throughout FEHA, section 12926 would take precedence, because it was the last enacted. Under the "highest chaptered number test," it is presumed "that a statute which has a higher chapter number was intended by the Legislature to prevail over a statute which is enacted at the same session but has a lower chapter number." (§ 9605; In re Thierry S. (1977) 19 Cal.3d 727, 739, 139 Cal.Rptr. 708, 566 P.2d 610.) The highest chaptered number test sets up a rebuttable presumption. (19 Cal.3d at p. 739, fn. 11, 139 Cal.Rptr. 708, 566 P.2d 610.) After the Governor signs legislation, the Secretary of State receives the bill and assigns a chapter number in the order of receipt. The order of numbering is presumed to be the order in which the Governor signed the bills. (§ 9510.) There is no indication that the Governor approved the bills at issue in any order other than indicated by the chapter numbers. For these reasons, we conclude that the trial court did not err in rejecting appellant's definitional instruction.[11]

*580 II
The Medical Center argues that, whether the FEHA or ADA standard is used, it did not fail to reasonably accommodate Dr. Swenson's disability. FEHA provides that it is an unlawful employment practice for an employer "to fail to make reasonable accommodation for the known physical or mental disability of an applicant or employee." (§ 12940, subd. (k).)[12]
Dr. Swenson's preference was that he be assigned to a teaching ward, as that would eliminate his problem in charting patients. The Medical Center presented evidence that Dr. Swenson was evaluated in the bottom quartile by psychiatry residents, and that its policy was not to offer teaching ward assignments to staff physicians who received so low a rating. We agree with the Medical Center that charting is an essential part of Dr. Swenson's work, and that the reason offered for refusing to reassign him to a teaching ward is neutral and reasonable. To hold otherwise would be to require that the Medical Center compromise the quality of its teaching program, a matter that is in its special competence to judge.
The difficulty with this evidence is that it is disputed. Dr. Swenson testified that Dr. Gray, the director of the psychiatric unit, told him that the reason Dr. Swenson was not assigned to a teaching ward was that "[w]e are hiring gunslingers, people who will come a year at a time, and we are not going to fill those slots with anybody that's here now." Whether Dr. Gray actually made the statement, and whether it is the real reason for not assigning Dr. Swenson to a teaching ward, are credibility questions, to be resolved by the trier of fact. On appeal we must, of course, indulge every inference supported by the evidence in favor of the decision of the trier of fact. (Watson v. Dept. of Rehabilitation (1989) 212 Cal.App.3d 1271, 1279, 261 Cal.Rptr. 204.) Applying that standard, we infer that the jury credited Dr. Swenson's testimony on the point.
The evidence also established that Dr. Swenson, through his attorney, asked for a number of alternative accommodations that could have ameliorated Dr. Swenson's disability as it applied to charting. These requests included giving him a quieter office, supplying dictating equipment and related computer software, and giving him longer hours of access to the medical records room. The Medical Center argues that there was no proof that any or all of these accommodations would have enabled Dr. Swenson to discharge his charting responsibilities. But a psychologist who examined Dr. Swenson testified that Dr. Swenson could continue to function as a staff psychiatrist if the Medical Center accommodated his impairment in the areas of writing and documentation, such as by providing mechanisms to aid him in that function. The jury also had evidence that Dr. Swenson had successfully completed his undergraduate and medical education, despite his handicaps, through self-discipline and self-accommodation. These practices included the typing of materials, which he found easier than handwriting. He found that quieter, more isolated environments were more conducive to his learning. Dr. Swenson had used tape recorders to record lectures and replay them, finding audio equipment more useful than written devices. These mechanisms are similar to the accommodations he requested from the Medical Center. We do not know with certainty whether any or all of them would have enabled Dr. Swenson to do the required charting. It is significant that the Medical Center refused to try any of them. The jury was entitled to *581 infer that these accommodations, or at least some of them, would have enabled Dr. Swenson to perform that task. The evidence which we have just summarized is sufficient to support that implied finding. (College Hospital, Inc. v. Superior Court (1994) 8 Cal.4th 704, 715, 34 Cal.Rptr.2d 898, 882 P.2d 894 ["a judgment will not be disturbed for lack of evidence if the evidence in support of the judgment is `substantial,' that is, enough to allow a reasonable jury to have reached the challenged result."].) We are not entitled to reweigh it on appeal. (Simon v. Steelman (1990) 224 Cal.App.3d 1002, 1005, 274 Cal.Rptr. 218.)

DISPOSITION
The judgment is affirmed. Respondent to have his costs and reasonable attorney's fees on appeal.
CHARLES S. VOGEL, P.J., and CURRY, J., concur.
NOTES
[1] All further statutory references are to the Government Code, except as otherwise indicated.
[2] Dr. Swenson later withdrew his claim of age discrimination.
[3] The Medical Center does not challenge the sufficiency of evidence to support the judgment under the standard on which the trial court instructed the jury.
[4] The full text of section 12926, subdivision (i), states, "`Mental disability' includes any mental or psychological disorder, such as mental retardation, organic brain syndrome, emotional or mental illness, and specific learning disabilities. However, `mental disability' does not include conditions excluded from the federal definition of `disability' pursuant to Section 511 of the Americans With Disabilities Act of 1990 (42 U.S.C., Sec. 12211). Additionally, for purposes of this part, the unlawful use of controlled substances or other drugs shall not be deemed, in and of itself, to constitute a mental disability."
[5] For physical disability, FEHA provides protection if an individual is "regarded as having or having had" specified physical conditions. (§ 12926, subd. (k)(3).) There is no similar provision in FEHA in regard to "mental disability."
[6] As noted, FEHA's definition of "physical disability" requires that an individual have a physical condition that only "limits"not "substantially limits"an individual's participation in major life activities. (§ 12926, subd. (k)(1)(B).)
[7] Section 12955.3 defines "disability" as "(a) A physical or mental impairment that substantially limits one or more of a person's major life activities[;][H] (b) A record of having, or being perceived as having, a physical or mental impairment, but not including current illegal use of, or addiction to, a controlled substance. ..."
[8] The full text of section 12926, subdivision (l), provides: "Notwithstanding subdivisions (i) and (k), if the definition of `disability' used in the Americans with Disabilities Act of 1990 (Public Law 101-336) would result in broader protection of the civil rights of individuals with a mental disability or physical disability, as defined in subdivision (i) or (k), or would include any medical condition not included within those definitions, then that broader protection or coverage shall be deemed incorporated by reference into, and shall prevail over conflicting provisions of, the definitions in subdivisions (i) and (k)."
[9] The beginning of the provision provides that its definitions apply, "As used in this part in connection with unlawful practices, unless a different meaning clearly appears from the context[.]" (§ 12926.) Section 12940 declares employment discrimination because of mental disability to be an "unlawful employment practice."
[10] The section defines "age," "medical condition," "mental disability," and "physical disability." FEHA prohibits employment discrimination on these bases. (§ 12940, subd. (a).) In regard to housing, FEHA does not prohibit discrimination because of age or medical condition. It also uses a single definition of "disability" in the housing context, rather than separately defining "mental disability" and "physical disability."
[11] As we have discussed, the trial court instructed the jury that "[a]n employee has a mental disability when he has or is regarded by his employer as having any mental disorder or condition which affects one or more major life activities." (Our emphasis.) While closer to FEHA's terms, it is arguable that this instruction is inconsistent with the statute. The instruction required that a mental disability affect one or more major life activities. FEHA considers a mental impairment to be a "mental disability" in employment as long as the condition is not otherwise excluded from protection. Arguably, an individual with a covered mental disability may seek the protection of FEHA in employment regardless of whether the mental impairment imposes a limitation on any major life activity. Of course, any error in this regard would have disfavored Dr. Swenson. He does not complain of prejudice and the verdict demonstrates that he suffered none. The parties have not briefed whether the instruction placed a greater burden on Dr. Swenson than FEHA requires. We do not decide that issue.
[12] The parties dispute which side has the burden of proof on this issue. We need not resolve that question since the trial court instructed the jury that Dr. Swenson bore the burden. Even if this were error, it is error in favor of the Medical Center, of which it cannot complain.