Filed 5/24/22

**CERTIFIED FOR PARTIAL PUBLICATION***

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE,<br><br>　　Plaintiff and Respondent,<br><br>　　　　v.<br><br>LEONARD CHARLES JONES,<br><br>　　Defendant and Appellant. | A160328<br><br>(Alameda County Super. Ct.<br>No. H56669) |

　　　　A jury convicted defendant Leonard Jones of attempted murder and related charges and enhancements. The trial court sentenced him to 59 years in prison. On appeal, Jones argues (1) a jury instruction on eyewitness identification evidence rendered his trial fundamentally unfair in violation of due process, (2) the court erred by denying his *Pitchess*[1] motion to discover information in police personnel files, and (3) the case should be remanded for resentencing. The Attorney General agrees a remand for resentencing is required in light of legislation that took effect after Jones's sentencing hearing. In the unpublished portion of this opinion, we reject Jones's challenges to his convictions. But as we explain in the published portion of

---

　　* Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of parts I.A.3., I.B., II.A., and II.B.

　　[1] *Pitchess v. Superior Court* (1974) 11 Cal.3d 531.

1

the opinion, we agree with the parties as to the impact of the new legislation. We therefore will remand for resentencing.

# I. BACKGROUND

The charges against Jones arose from a shooting that took place in the parking lot of a San Leandro apartment complex on the evening of June 16, 2013. Jones's defense at trial was that he was misidentified and was not the shooter.

## A. *The Prosecution's Case*

### 1. Background: Events Prior to the Shooting

In 2013, 16-year-old P.T. lived in the complex with her aunt. Jones's sister, Lyndetta Jones, also lived in the complex, and Jones sometimes visited the property.

P.T. testified she had two interactions with Jones at the apartment complex prior to the date of the shooting. On the first occasion, Jones approached P.T. in the parking lot and asked for her name. Because P.T. did not know Jones and was not interested in him, she gave him a fake name, "Nancy."

On the second occasion, which was about a week before the shooting, Jones tried to ask P.T. out. She told him to leave her alone and that she had a boyfriend. Jones persisted, and he and P.T. began cursing at each other. Jones then pulled out a gun, pointed it at P.T., and told her she should not curse at him or she would see what happens.

### 2. The Shooting

On June 16, 2013, around 9:00 p.m., 22-year-old Gbessaykai Massaquoi was with P.T. in his two-door Honda Civic hatchback at the San Leandro Marina. Massaquoi was smoking marijuana. P.T. and Massaquoi were friends.

2

Massaquoi then drove to Hayward and picked up three other friends, 22-year-old Najeem Mirzada, 21-year-old Sandip Prasad, and 18-year-old Cedric Sallie. P.T. sat in the front passenger seat, and Massaquoi's three other friends sat in back.

Massaquoi drove the group back to San Leandro to drop P.T. off at her home. He dropped her off at a liquor store near the apartment complex, rather than at the complex. Massaquoi testified that he dropped P.T. off there only because it was convenient and because P.T. told him to. P.T. testified Massaquoi dropped her off there so that her aunt would not see her hanging out with an adult man.

After P.T. got out of the car, Massaquoi saw a man walking quickly behind her while holding a paper bag that appeared to contain a bottled drink. Massaquoi described this male as a fit Black man, five feet nine inches to five feet 10 inches tall, with short hair, and wearing a white shirt and white pants. Cedric Sallie described the man as Black, six feet tall with short hair, and no facial hair, and weighing 160 to 170 pounds. Sandip Prasad, who had moved to the front seat when P.T. got out of the car, described the African-American man following P.T. as 25 to 30 years old, six feet tall and 160 pounds, with short curly hair, and wearing a white tank top with dark jeans. Najeem Mirzada described the fit man following P.T. as Black, about six feet to six feet two inches tall, with short hair and in his mid-20's, and wearing a white shirt and light-colored baggie jeans.

P.T. testified Jones was the man following her. Jones came up from behind her and got close to her side, about a foot away, and tried talking to her. However, given what had happened between them previously, P.T. was nervous, scared, walking fast, and not paying attention to Jones's words. P.T. had testified at the preliminary hearing that Jones walked behind her.

Massaquoi never saw P.T. turn around and look at the man. Massaquoi testified that the man started out about 14 feet behind P.T., and eventually closed the gap to about six to seven feet.

Because Massaquoi believed the man was following P.T., he made a U-turn and drove into the apartment complex parking lot, stopping next to P.T. and asking her if she was okay. Massaquoi testified that P.T. looked scared and did not reply as she kept walking. P.T. testified that she replied " 'yes' " to Massaquoi's request that she call him after she got to her apartment.

After P.T. walked out of view, the man who had been following her pulled out a black gun, approached the Honda, and asked if they had a problem. Massaquoi's window was halfway down, and he responded he was " 'just trying to make sure if she's okay.' " The man replied, " 'Oh, yeah I know Nancy,' " and told them to "bounce" or leave, in an angry tone. Massaquoi put the car in reverse and heard five to six gunshots. A bullet shattered the car window, and Massaquoi was hit in the ankle and forearm. Massaquoi was able to drive to a gas station, where he and Prasad switched seats. Prasad then drove to a hospital.

A resident of the complex, Olayo Maradiaga, arrived home and was outside his apartment when he saw a Black man arguing with people in a car. The man fired three or four shots at the car and ran away. Maradiaga told officers he would not be able to identify the shooter because he had been very far away (about 60 meters) and it was already nighttime.

Heather Tackett, the property manager for the apartment complex and a resident there, was in her apartment on the evening of June 16, 2013, and heard gunshots outside. She called 911 and looked out through the blinds on her living room window. She saw someone running through the parking lot.

4

Tackett recognized the man as the brother of resident Lyndetta Jones (although she did not know his name). Tackett had interacted with him on about five occasions. Tackett told the 911 operator that she saw a man who " 'looked like' " the brother of one of her residents.

### 3. The Lineups and Witness Identifications

Sergeant Robert Young of the Alameda County Sheriff's Department conducted a photo lineup on June 17, 2013, the day after the shooting. In the lineup, which another officer had prepared, Jones was the number five photo in the set of six photos. P.T. identified number five, Jones, as the man who had followed her the previous evening. She did not see that person shoot a gun.

The four men who were in Massaquoi's car at the time of the shooting—Massaquoi, Sallie, Prasad, and Mirzada—were shown the same photo lineup on June 17, 2013, the day after the shooting. They did not identify any of the men in the photo lineup as the shooter. When Sergeant Young asked which of the people in the lineup looked " 'the closest' " to the person who shot into the car, Massaquoi chose photo numbers three and six.

Sergeant Young later received a more recent booking photo of Jones and thought he looked "completely different" from the photo used in the June 17 lineup. He used this photo to create a second lineup, this time placing Jones's photo in position number one. Jones was the only person who appeared in both the first and second photo lineups.

On July 28, 2013, Sergeant Young met the occupants of the Honda at a Starbucks coffee house to show them the second photo lineup. Massaquoi selected photo number one (Jones). In August 2014, Massaquoi told a deputy district attorney that he chose photo number one on July 28, 2013, because it "looked the most like" the shooter. Massaquoi also told the deputy district

5

attorney he was "not very confident" in his selection. At the preliminary hearing in September 2014, Massaquoi did not identify Jones as the shooter.

At trial, however, Massaquoi identified Jones as the shooter. He also testified he was very confident in his July 28, 2013 selection of Jones's photo as the photo of the man who shot him. He stated he had been unable to identify Jones at the preliminary hearing because of differences in Jones's facial hair.

As for the other men in the car, Sandip Prasad made a "partial identification" at the second photo lineup, stating, " 'The person that shot my friend looked like number 1 [the photo of Jones], but with darker facial hair on the night of the shooting.' " Prasad did not identify Jones in court. At the Starbucks photo lineup, Cedric Sallie was unable to identify anyone other than to say that the man in photo five had "similar hair" to the shooter. Sallie could not identify Jones in court. Najeem Mirzada did not identify Jones at the Starbucks photo lineup or in court.

On July 30, 2013, Heather Tackett participated in a photo lineup. She pointed to Jones's photo and told police, " 'This is the person I saw.' " Tackett also identified Jones at trial as the man she saw running away from the area of the gunshots on the evening of June 16, 2013.

On July 31, 2013, Olayo Maradiaga participated in a photo lineup and picked out Jones's photo, stating he was " 'not a hundred percent sure' " because the shooter had been " 'very far away from him.' " Maradiaga testified both that he assumed, and did not assume, that the police had a suspect when he looked at the photo lineup. He did his best to choose the photo of the person "who looked the most like the shooter." Maradiaga could not identify Jones at trial.

**B. *The Defense Case***

As noted, Jones's defense was misidentification. Dr. Mitchell Eisen testified as an expert in witness memory. Dr. Eisen testified as to various factors that can affect the reliability of eyewitness identifications. As to the relationship between a witness's confidence in making an identification and the accuracy of that identification, Dr. Eisen testified: "We know that when somebody makes a choice, if it's a fair and unbiased task, that confidence at the time of choosing is generally related to accuracy. It's not perfect, it's not diagnostic, but it's generally a positive relationship, as well as speed in choosing. [¶] However, once you get—in addition to the caveats I gave you if it's an unfair task or if there's problems with the task that excuse it, more importantly, once you get outside of that box, once you get outside of that moment of choosing, then confidence isn't related to accuracy at all." Dr. Eisen later reiterated: "[I]t turns out confidence at the time of the ID when it's a fair task is a decent indicator of accuracy, but then confidence is totally unrelated to accuracy once you get outside of that box."

Jones's sister Lyndetta Jones lived at the apartment complex in June 2013, and Jones visited her a few times a week. On the evening of the shooting, June 16, Ms. Jones arrived home from work as early as 7:45 p.m. and as late as around 8:30 p.m. She did not see Jones that night. Ms. Jones heard gunshots and went outside to see what had happened.

Jones's friend Shanay Mallory lived down the street from the apartment complex, and Jones visited frequently in 2013. Mallory did not see Jones on the day of the shooting.

A defense investigator took photos toward the parking lot from the window of the apartment where Tackett had lived at the time of the shooting. He was unable to see the facial features of people standing about 90 feet away at night.

7

## C. *Procedural Background:  The Charges, Verdicts, and Sentence*

An information filed in October 2014 charged Jones with four counts of attempted murder (counts 1–4; Pen. Code,[2] §§ 187, subd. (a), 664), i.e., one count pertaining to each of the four people in the car at the time of the shooting—Massaquoi, Sallie, Prasad, and Mirzada.  The information also charged Jones with four counts of assault with a semiautomatic firearm (counts 5–8; § 245, subd. (b)) (as to the same four people), one count of shooting at an occupied vehicle (count 9; § 246), and one count of being a felon in possession of a firearm (count 10; § 29800, subd. (a)(1)).  The information alleged as to the attempted murder counts that Jones personally used and intentionally discharged a firearm (§§ 12022.5, subd. (a), 12022.53, subds. (b), (c)), and as to the assault charges that he personally used a firearm (§ 12022.5, subd. (a)).  The information alleged Jones had a prior serious felony conviction (§ 667, subd. (a)(1))—a 2004 conviction for carjacking—that qualified as a "strike" (§§ 667, subd. (e)(1), 1170.12, subd. (c)(1)), and for which he had served a prison term (§ 667.5, former subd. (b)).

In February 2016, the jury found Jones guilty of the attempted murder of Massaquoi as charged in count 1 and found true the associated firearm enhancements.  The jury found Jones not guilty of the attempted murders of Sallie, Prasad, and Mirzada as charged in counts 2 through 4.  The jury found Jones guilty of all four counts of assault with a semiautomatic firearm (counts 5 through 8) and the firearm enhancements for those counts, as well as the count 9 charge of shooting at an occupied vehicle and the count 10 charge of being a felon in possession of a firearm.  Jones waived his right to a jury trial on the prior conviction allegation, and the court found the

---

[2] Undesignated statutory references are to the Penal Code.

8

allegation true. The record does not reflect that the court addressed the prior prison term enhancement allegation.

On December 16, 2019, nearly four years after the jury verdict, Jones, now represented by a different attorney, filed a motion for new trial. On February 28, 2020, the court denied the motion for new trial and sentenced Jones to 56 years in prison, with credit for 2,398 days of actual time served, plus additional conduct credit. Jones appealed.

In April 2020, the court filed amended minutes and an amended abstract of judgment revising its sentencing calculations and reflecting that it had sentenced Jones to 59 years in prison, determined as follows: On the count 1 attempted murder conviction (§§ 187, subd. (a), 664), the court imposed the upper term of nine years, doubled to 18 years because of Jones's prior strike (§§ 667, subd. (e)(1), 1170.12, subd. (c)(1)). As to its selection of the upper term for count 1, the court had identified several aggravating factors at the February 2020 sentencing hearing: (1) the crime involved great violence and the threat of great bodily harm; (2) Jones used a weapon during the commission of the crime; (3) the victim (Massaquoi) was particularly vulnerable; (4) Jones had engaged in violent conduct and posed a serious danger to society; (5) he had served a prior prison term; and (6) he was on parole when he committed the present crime. The court stated there were no factors in mitigation.

The court imposed a consecutive 20-year term for the count 1 enhancement that during the commission of the attempted murder Jones personally and intentionally discharged a firearm (§ 12022.53, subd. (c)). As to the convictions in counts 6 through 8 for assault with a semiautomatic firearm, the court imposed consecutive terms of four years each (§ 245, subd. (b)) (one-third of the middle term, doubled due to the prior strike), with

9

consecutive terms of 16 months (one-third of the middle term) on the attendant gun-use enhancements (§ 12022.5, subd. (a)). The court imposed a consecutive five-year term for Jones's prior serious felony conviction (§ 667, subd. (a)(1)).[3] As to the remaining counts of conviction (counts 5, 9, and 10), the court imposed middle terms but stayed them pursuant to section 654.

## II. DISCUSSION

### A. *The Inclusion of Witness Certainty as a Factor in the Instruction on Eyewitness Identification Evidence Did Not Violate Jones's Due Process Rights*

The trial court instructed the jurors with a version of CALCRIM No. 315, which listed 14 factors they should consider when evaluating eyewitness identification evidence. One of the factors was: "How certain was the witness when he or she made an identification?"[4]

---

[3] The minute order and abstract of judgment incorrectly state this five-year term was imposed pursuant to section 667.5, subdivision (b); the five-year term for a prior serious felony conviction is authorized by section 667, subdivision (a)(1). We will direct that, if the superior court again imposes this five-year term on resentencing, the abstract of judgment should reflect that the basis for the term is section 667, subdivision (a)(1).

As noted, the information did also allege that Jones had served a *prior prison term*, which would have triggered a one-year enhancement under section 667.5, former subdivision (b). That enhancement was not imposed here, and the prior prison term Jones served for his 2004 carjacking conviction no longer provided a basis for a section 667.5, subdivision (b) one-year term by the time of Jones's February 2020 sentencing. (See § 667.5, subd. (b), as amended by Stats. 2019, ch. 590, § 1 [authorizing additional one-year term only where defendant's prior prison term was for a sexually violent offense].)

[4] The instruction stated: "You have heard eyewitness testimony identifying the defendant. As with any other witness, you must decide whether an eyewitness gave truthful and accurate testimony. [¶] In

10

Jones contends that, by instructing the jury to consider witness certainty in assessing eyewitness identification evidence, the court rendered his trial fundamentally unfair and thus violated his due process rights. He argues the instruction misleadingly suggests a witness's certainty in making an identification is correlated with the accuracy of the identification. We find no due process violation on this record.

In *People v. Lemcke* (2021) 11 Cal.5th 644, 646 (*Lemcke*), our Supreme Court rejected a similar due process claim arising from CALCRIM No. 315. The court outlined the governing standard: " 'The touchstone of due process is fundamental fairness.' [Citations.] A jury instruction may ' "so infuse[] the trial with unfairness as to deny due process of law." ' [Citation.] However, ' "not every ambiguity, inconsistency, or deficiency in a jury instruction rises to the level of a due process violation. The question is ' "whether the ailing

---

evaluating identification testimony, consider the following questions: [¶] Did the witness know or have contact with the defendant before the event? [¶] How well could the witness see the perpetrator? [¶] What were the circumstances affecting the witness's ability to observe, such as lighting, weather conditions, obstructions, distance, and duration of observation? [¶] How closely was the witness paying attention? [¶] Was the witness under stress when he or she made the observation? [¶] Did the witness give a description and how does that description compare to the defendant? [¶] How much time passed between the event and the time when the witness identified the defendant? [¶] Was the witness asked to pick the perpetrator out of a group? [¶] Did the witness ever fail to identify the defendant? [¶] Did the witness ever change his or her mind about the identification? [¶] How certain was the witness when he or she made an identification? [¶] Are the witness and the defendant of different races? [¶] Was the witness able to identify the defendant in a photographic or physical lineup? [¶] Were there any other circumstances affecting the witness's ability to make an accurate identification? [¶] The People have the burden of proving beyond a reasonable doubt that it was the defendant who committed the crime. If the People have not met this burden, you must find the defendant not guilty." (Some punctuation omitted.)

11

instruction . . . so infected the entire trial that the resulting conviction violates due process." ' " ' [Citation.] ' "It is well established that the instruction 'may not be judged in artificial isolation,' but must be considered in the context of the instructions as a whole and the trial record." ' [Citations.] ' "If the charge as a whole is ambiguous, the question is whether there is a ' "reasonable likelihood that the jury has applied the challenged instruction in a way" that violates the Constitution.' " ' " (*Lemcke*, at p. 655.)

As to the challenge in that case, the *Lemcke* court rejected the claim by a defendant there (Rudd) that the witness certainty factor in CALCRIM No. 315 violated his due process rights. (*Lemcke*, *supra*, 11 Cal.5th at p. 646.) The court determined that, when considered in light of the trial record as a whole (including expert testimony presented by the defense and other instructions given to the jury), inclusion of the certainty factor in CALCRIM No. 315 did not render the defendant's trial fundamentally unfair. (*Lemcke*, at pp. 646–647, 661; see *People v. Wright* (2021) 12 Cal.5th 419, 452–453 [applying *Lemcke* and rejecting due process challenge to analogous instruction, CALJIC No. 2.92].)

Although it found no due process violation, the *Lemcke* court concluded that reevaluation of "the certainty instruction" was warranted, because empirical research shows that " 'eyewitness confidence is generally an unreliable indicator of accuracy.' " (*Lemcke*, *supra*, 11 Cal.5th at p. 647.) The court referred the issue to the Judicial Council and its Advisory Committee on Criminal Jury Instructions "to evaluate whether or how the instruction might be modified to avoid juror confusion regarding the correlation between certainty and accuracy." (*Ibid.*) Finally, the Supreme Court in *Lemcke*, acting pursuant to its supervisory powers, directed that "until the Judicial Council has completed its evaluation, trial courts should omit the certainty

factor from CALCRIM No. 315 unless the defendant requests otherwise." (*Id.* at pp. 647–648.)[5]

Here, we conclude that, for many of the same reasons present in *Lemcke*, the inclusion of the certainty factor as one of 14 listed in CALCRIM No. 315 did not render Jones's trial fundamentally unfair or violate his due process rights.[6]  As outlined by the *Lemcke* court, the defendant there argued that "instructing the jury to consider an eyewitness's level of certainty, without clarifying the limited correlation between certainty and accuracy, violates due process in two ways.  First, the instruction 'lowers the prosecution's burden of proof' by causing jurors to 'equat[e] certainty with accuracy, when science establishes otherwise.'  Second, the instruction denies the defendant 'a "meaningful opportunity to present a complete defense" ' as to 'why the identification was flawed . . . .' " (*Lemcke, supra*, 11 Cal.5th at p. 657.)

---

[5] We note CALCRIM No. 315 was revised in March 2022 to include the certainty question in brackets, a bracketed admonition that a witness's expression of certainty "may not be a reliable indicator of accuracy," and a further set of bracketed factors for the jury to consider when evaluating the significance of the witness's certainty, along with directions as to when each of these portions of the instruction should be given.  (CALCRIM No. 315 (2022 ed.); *id.*, Bench Notes.)

[6] The Attorney General argues Jones forfeited his claim of instructional error because his trial counsel did not object to inclusion of the certainty factor in CALCRIM No. 315 or ask the court to modify the instruction.  (See *People v. Sánchez* (2016) 63 Cal.4th 411, 461–462 [defendant forfeited challenge by not requesting modification of analogous instruction, CALJIC No. 2.92].)  But in light of the Supreme Court's decision in *Lemcke* raising potential constitutional issues with the eyewitness identification instruction (depending on the record), we review the merits of Jones's contention the instruction violated his constitutional rights on the record before us.  (See § 1259 [even absent trial objection, appellate court may review claim of instructional error that affects defendant's substantial rights].)

The *Lemcke* court rejected both arguments.  (*Lemcke*, *supra*, 11 Cal.5th at pp. 657–660.)  As to the burden of proof, the court noted "the instruction does not direct the jury that 'certainty equals accuracy' " and does not "state that the jury must presume an identification is accurate if the eyewitness has expressed certainty." (*Lemcke*, *supra*, at p. 657.)  The instruction just lists the witness's level of certainty as one of numerous factors the jury should consider when evaluating eyewitness testimony, with the jury free to determine what weight to give each factor.  (*Ibid.*)  These observations apply equally to CALCRIM No. 315 as given in this case.

The *Lemcke* court noted "the wording of the instruction might cause some jurors to infer that certainty is generally correlative of accuracy," but the court emphasized the defendant "was permitted to present expert witness testimony to combat that inference." (*Lemcke*, *supra*, 11 Cal.5th at pp. 657–658.)  Dr. Mitchell Eisen (the same expert who testified at Jones's trial) testified in *Lemcke* "that the only time certainty may be useful in assessing accuracy is when the identification is made in close temporal proximity to the event and law enforcement has utilized nonsuggestive procedures.  According to Eisen, 'outside that window, . . . confidence is not related to accuracy in any regard.'  Eisen emphasized that in-trial identification testimony is particularly meaningless because it does not 'reflect[] memory.'  Eisen also described the procedures law enforcement should follow to ensure an accurate identification and answered a series of hypothetical questions that were designed to show those procedures were not followed in this case." (*Id.* at p. 658.)

Also in support of its conclusion that CALCRIM No. 315 did not lower the prosecution's burden of proof, the *Lemcke* court pointed to the language of that instruction and several other instructions given to the jury.  CALCRIM

14

No. 315 did not suggest the jury should ignore Eisen's expert opinion on witness certainty, and in fact the jury "received a separate instruction on expert testimony (CALCRIM No. 332) directing that it '*must* consider th[ose] opinions.' (Italics added.)" (*Lemcke, supra*, 11 Cal.5th at p. 658.) "The jury also received a general instruction on witness testimony explaining that '[p]eople sometimes honestly . . . make mistakes about what they remember' and that the jurors were responsible for 'judg[ing] the credibility or believability of the witnesses.' The jury 'thus remained free to exercise its collective judgment to reject what it did not find trustworthy or plausible.' " (*Ibid.*) Finally, the trial court in *Lemcke* "expressly directed the jury that Rudd was presumed innocent, and that the prosecution had the burden of proving all elements of the crime beyond a reasonable doubt," a point that was reiterated in CALCRIM No. 315 itself as to Rudd's identity, with the instruction specifying: " 'The People have the burden of proving beyond a reasonable doubt that it was the defendant who committed the crime. If the People have not met this burden, you must find the defendant not guilty.' " (*Lemcke*, at p. 658.)

The same factors identified in *Lemcke* are present in this case, and we conclude the inclusion of the witness certainty factor in CALCRIM No. 315 did not lower the prosecution's burden of proof or otherwise violate due process here.[7] Dr. Eisen testified at Jones's trial (as he did in *Lemcke*) that,

---

[7] As to the defendant's second due process argument in *Lemcke*—that CALCRIM No. 315 denied him the opportunity to present a complete defense on the issue of identity—the Supreme Court was unpersuaded. (*Lemcke, supra*, 11 Cal.5th at p. 660.) The court noted the defendant there "was permitted to put on a vigorous defense on the issue of identity," including by presenting expert testimony, emphasizing that testimony in closing argument, and cross-examining the eyewitness about her identification and

15

except in certain circumstances, a witness's level of certainty is not related to accuracy. (*Lemcke, supra*, 11 Cal.5th at pp. 657–658.) And the instructions highlighted in *Lemcke* were given here, including (1) CALCRIM No. 332 (directing the jury to consider the opinions of experts), (2) a general instruction on witness credibility (CALCRIM No. 226) that noted people sometimes make mistakes about what they remember, and emphasized the jury is responsible for assessing credibility, (3) an instruction stating Jones was presumed innocent and the prosecution had the burden to prove his guilt beyond a reasonable doubt (CALCRIM No. 220), and (4) the language in CALCRIM No. 315 itself that reiterated that point specifically as to identity, requiring proof beyond a reasonable doubt "that it was the defendant who committed the crime."

Jones argues that, in contrast to *Lemcke*, the inclusion of the certainty factor in CALCRIM No. 315 *did* render his trial fundamentally unfair and thus violated his due process rights. He contends Dr. Eisen "testified less definitively" in his case than in *Lemcke* about the limited correlation of witness certainty and accuracy. We disagree. In both *Lemcke* and the present case, Dr. Eisen testified that a witness's early expression of certainty is related to accuracy when the identification procedure is fair and unbiased. (*Lemcke, supra*, 11 Cal.5th at pp. 651–652, 658.) Dr. Eisen also testified here, similar to his testimony in *Lemcke*, that certainty is not indicative of accuracy when there is a biased procedure *or* when time has passed since the

the investigating officers about the lineup procedures. (*Ibid.*) Here, too, Jones was permitted to present expert testimony about witness identification; his counsel cross-examined witnesses about the identifications and the lineup procedures; and counsel argued the issue of identity to the jury. Jones does not appear to argue he was deprived of an opportunity to present a complete defense, and any such argument would fail.

16

witness's first identification, because of the "post identification feedback effect," i.e., the bolstering of the witness's confidence by the progress of the investigation (including in some cases the arrest or charging of a suspect) or by being told that he or she picked the right person. (*Ibid.*) We are not persuaded by Jones's suggestion that fine distinctions in the wording used by Dr. Eisen in the two cases detracted from these fundamental points.

Jones also notes that, on cross-examination in the present case, the prosecutor asked Dr. Eisen about the factors listed in CALCRIM No. 315. Dr. Eisen stated the listed factors "are basically studied factors because they're commonsensically related." Dr. Eisen further stated: "This is what the Supreme Court decided in the '70s, before a lot of this research, commonsensically jurors should consider when evaluating eyewitness testimony." Jones is incorrect in suggesting Dr. Eisen's descriptive statements about the factors listed in the pattern instruction somehow amounted to an endorsement of them. We do not agree that Dr. Eisen's testimony here was less helpful to the defense than the testimony he provided in *Lemcke*, or that any distinctions between his testimonies on the two occasions resulted in a due process violation. The testimony in each case allowed the defense to "combat" the possible inference that "some jurors" "might" draw from CALCRIM No. 315 "that certainty is generally correlative of accuracy." (*Lemcke, supra,* 11 Cal.5th at pp. 657–658.)

Jones's remaining arguments are not persuasive. He contends the direction in CALCRIM No. 332 (an instruction cited in *Lemcke*) that the jury is to consider the opinions of experts served here to reinforce the allegedly lukewarm nature of Dr. Eisen's testimony. As discussed, we disagree with Jones's characterization of that testimony. Neither the expert testimony nor

17

the instruction directing the jury to consider it supports his due process claim.

Jones also notes that the prosecutor in closing argument stressed P.T.'s and Tackett's certainty in their identifications, along with Massaquoi's positive identification in court. The prosecutor also mentioned CALCRIM No. 315's certainty factor, along with several of the other factors listed in the instruction. Jones suggests this point was argued less forcefully by the prosecutor in *Lemcke*, but (as summarized by the Supreme Court) the prosecutor there too noted the sole eyewitness had been consistent in identifying the defendants, and pointed to several of the factors in CALCRIM No. 315, including the certainty factor. (*Lemcke*, *supra*, 11 Cal.5th at p. 652.) Moreover, as the Attorney General notes, Jones's trial counsel in his summation attacked the reliability of the identifications of Jones and emphasized the instances where witnesses did not identify him. In this context and in light of the record as a whole, we do not agree with Jones that the arguably problematic certainty factor (again, one of 14 listed in CALCRIM No. 315 for the jurors to consider and weigh as they saw fit) infected the entire trial so as to render it fundamentally unfair.

Finally, Jones argues the questions from the jurors (asking for readback of P.T.'s and Tackett's testimony) and the length of their deliberations (which he calculates at 19 hours) suggest that the case was close and that witness certainty "likely played an important role" in the jurors' decision. As the Attorney General notes and as Jones appears to acknowledge, the purported closeness of the identification issue would not on its own establish a violation of due process. In light of the factors we have discussed above—including Dr. Eisen's testimony, the full set of instructions

18

given to the jury, and the arguments of counsel—we conclude the inclusion of the certainty factor in CALCRIM No. 315 did not violate due process here.

## B. *Alleged* Pitchess *Error*

Jones argues (1) the court erred by denying his pretrial motion for discovery of information in police personnel records pursuant to *Pitchess*, (2) the court erred by denying his new trial motion alleging in part that the pretrial *Pitchess* ruling was error, and (3) to the extent it would not have been futile for his trial counsel to renew the *Pitchess* motion during trial, his counsel provided ineffective assistance by failing to do so. We reject these arguments.

### 1. Additional Background

On November 16, 2015, prior to trial, Jones filed a *Pitchess* motion alleging intentional suggestiveness in the photo lineup procedures, through either words or actions, by Alameda County Sheriff's Office Deputies Robert Young and Gustavo Mora. County counsel filed an opposition arguing the motion was overbroad and otherwise defective, including for failure to file a declaration showing good cause for the discovery (see Evid. Code, § 1043, subd. (b)(3)). Jones filed a supplemental motion and an accompanying declaration of counsel on January 27, 2016. Jones sought disclosure of information about "complaints from any and all sources relating to acts of violation of constitutional rights, fabrication of charges, fabrication of evidence, fabrication of reasonable suspicion and/or probable cause, illegal search/seizure; false arrest, perjury, and any other evidence of misconduct amounting to moral turpitude . . . ."

Jones alleged (in his initial motion and by incorporation in his supplemental motion) that Deputy Young conducted an unfairly suggestive second photo lineup with the four occupants of the car, where Jones was the only person to appear in both lineups. Jones also suggested improper

19

influence was placed on Maradiaga, who said on the night of the incident that he would not be able to identify the shooter, but then identified Jones in a lineup six weeks later. Jones stated Deputy Young asked Deputy Mora to conduct the lineup with Maradiaga, who spoke Spanish.

In his supplemental motion, Jones included additional allegations about Young. Jones pointed to evidence Heather Tackett had stated (and testified at the preliminary hearing) that she made her observations from inside her apartment, but in an affidavit for a search warrant for DNA evidence, Deputy Young averred that Tackett went outside her apartment where she saw Jones, who then drove away in a car. Jones also stated that Young would testify Massaquoi had identified Jones at a lineup, but that Massaquoi denied having made an identification.

In his declaration in support of the supplemental motion, defense counsel stated it would be Jones's position at trial that Deputy Young "conducted a lineup that was purposely suggestive." But the declaration's principal focus was a broader assertion that Deputy Young's veracity was a significant issue in the case. In that regard, the declaration stated that a question at trial would be whether Young falsely represented that Massaquoi had identified Jones at the unrecorded second lineup, which Massaquoi denied having done. As another example of the importance of Deputy Young's veracity, the declaration pointed to Young's statement in his search warrant affidavit that Tackett was outside her apartment when she saw Jones and that she saw him drive away, a version of events that was inconsistent with Tackett's prior testimony.[8]

---

[8] Paragraphs 5–7 of the declaration set forth these allegations as follows: "5. A substantial issue in the case at bar is the veracity of Deputy Young. Specifically, at issue will be whether the Deputy falsely represented

20

Counsel stated in his declaration that evidence of complaints against Deputy Young alleging a lack of truthfulness or fabrication of evidence was necessary for a proper defense because the evidence would help counsel (a) locate witnesses and other evidence that Young had a "character trait for a lack of truthfulness to show that he acted in conformity with that character trait," (b) locate witnesses and other evidence that Young had a "character trait and propensity for fabricating or embellishing evidence, to show that he acted in conformity with that character trait in this case and/or acted consistently with that propensity," (c) properly prepare a cross-examination of Young, an essential prosecution witness, with the goal of showing Young had "a morally lax character and a propensity to lie and fabricate evidence," and (d) properly assess the credibility of Jones's potential testimony and that of prosecution witnesses such as Tackett. The declaration focused solely on Deputy Young and did not include any allegations about Deputy Mora.[9]

_____

the untap[ed] conversation with eye witness Mr. Massaquoi in which Deputy Young claims that Mr. Massaquoi positively identified defendant, and Mr. Massaquoi claims to have not done so. [¶] 6. Another specific instance of the importan[ce] of Deputy Young's veracity arise[s] from his alleged false statements, written under penalty of perjury, in which he had factual assertions about the eye witness account of witness Heather Tackett. In his search warrant affidavit, Deputy Young claimed that Ms. Tacket[t] observed defendant from outside her residence and saw defendant drive away. Ms. Tacket[t] has testified inconsistently with these assertions by the deputy. [¶] 7. Defendant has pled not guilty, and has maintained his innocence. It will be the defense's position at trial that Deputy Young conducted a lineup that was purposely suggestive and then misrepresented the statements made by the witness participants in that lineup. It will also be defendant's claim at trial that Deputy Young's statements in his affidavit describing Ms. Tacket[t]'s account of his identification were false."

[9] It appears the defense had narrowed its focus to Deputy Young by the time of the filing of the supplemental motion. The supplemental motion does in one spot reiterate the request from the initial motion seeking records about

21

After hearing argument on the *Pitchess* motion, the court denied it without prejudice. At the hearing, the court and counsel focused on the instances of alleged misconduct highlighted by defense counsel in his supplemental papers, starting with Deputy Young's alleged misrepresentation in the search warrant affidavit about what Tackett said about where she was standing when she saw Jones after hearing the gunshots. The court expressed the view that, because Young's affidavit established probable cause to search even without the statements of Tackett, the officer may have been "somewhat negligent" at worst.

As to Deputy Young's statement that Massaquoi had identified Jones in the unrecorded second lineup, defense counsel noted at the hearing that Massaquoi later told a deputy district attorney that he had not made a positive identification. Counsel also noted that at the preliminary hearing, Massaquoi did not identify Jones as the shooter. The court suggested Massaquoi's failure to identify Jones (after having reportedly done so in the second lineup) might stem from fear of retaliation for testifying. The court also emphasized, however, that "[w]e don't know what [Massaquoi is] going to say at trial." In part for that reason, the court denied the *Pitchess* motion without prejudice.

In his new trial motion filed in December 2019, Jones argued in part that the court erred by denying his pretrial *Pitchess* motion for discovery of information from Deputy Young's personnel file. Jones contended the court needed to "remedy that error" by conducting the in camera review it should have conducted pretrial and determining whether the defense "was

Deputies Young and Mora, but the memorandum in support of the supplemental motion states that the initial motion was "denied" by the court and that Jones is now "seeking the same discovery *with respect to Deputy Young*." (Italics added.)

22

prejudiced by that error." At the hearing on the new trial motion, Jones's counsel argued the pretrial *Pitchess* motion had sufficiently alleged officer misconduct to warrant in camera review. The court denied the new trial motion without comment.

### 2. Analysis

*Pitchess* establishes that "a criminal defendant [can] 'compel discovery' of certain relevant information in the personnel files of police officers by making 'general allegations which establish some cause for discovery' of that information and by showing how it would support a defense to the charge against him." (*Warrick v. Superior Court* (2005) 35 Cal.4th 1011, 1018–1019 (*Warrick*); see Pen. Code, §§ 832.7, 832.8; Evid. Code, §§ 1043–1045.) Pursuant to *Pitchess* discovery procedure, the moving party must file a written motion describing the type of records sought, supported by "[a]ffidavits showing good cause for the discovery or disclosure sought, setting forth the materiality thereof to the subject matter involved in the pending litigation and stating upon reasonable belief that the governmental agency identified has the records or information from the records." (Evid. Code, § 1043, subd. (b)(3).) "A motion for discovery of peace officer personnel records is addressed to the sound discretion of the trial court, reviewable for abuse." (*Alford v. Superior Court* (2003) 29 Cal.4th 1033, 1039 (lead opn. of Werdegar, J.).)

To establish good cause for in camera review of an officer's personnel records, "defense counsel's declaration in support of a *Pitchess* motion must propose a defense or defenses to the pending charges. The declaration must articulate how the discovery sought may lead to relevant evidence or may itself be admissible direct or impeachment evidence [citations] that would support those proposed defenses. These requirements ensure that only information 'potentially relevant' to the defense need be brought by the

23

custodian of the officer's records to the court for its examination in chambers. [Citations.] [¶] Counsel's affidavit must also describe a factual scenario supporting the claimed officer misconduct. That factual scenario, depending on the circumstances of the case, may consist of a denial of the facts asserted in the police report." (*Warrick*, *supra*, 35 Cal.4th at pp. 1024–1025.)

"In other cases, the trial court hearing a *Pitchess* motion will have before it defense counsel's affidavit, and in addition a police report, witness statements, or other pertinent documents. The court then determines whether defendant's averments, '[v]iewed in conjunction with the police reports' and any other documents, suffice to 'establish a plausible factual foundation' for the alleged officer misconduct and to 'articulate a valid theory as to how the information sought might be admissible' at trial. [Citation.] . . . What the defendant must present is a specific factual scenario of officer misconduct that is plausible when read in light of the pertinent documents." (*Warrick*, *supra*, 35 Cal.4th at p. 1025.) "[A] plausible scenario of officer misconduct is one that might or could have occurred. Such a scenario is plausible because it presents an assertion of specific police misconduct that is both internally consistent and supports the defense proposed to the charges. A defendant must also show how the information sought could lead to or be evidence potentially admissible at trial. Such a showing 'put[s] the court on notice' that the specified officer misconduct 'will likely be an issue at trial.' " (*Id.* at p. 1026.)

Applying these standards here, we first conclude the court's denial of in camera review was not an abuse of discretion as to Deputy Mora. Defense counsel's *Pitchess* declaration did not allege any misconduct by Mora (or mention his name), and the memorandum in support of the supplemental *Pitchess* motion explained the motion was being renewed specifically as to

24

Deputy Young. We reject the suggestion in Jones's appellate briefs that the court should have reviewed Deputy Mora's personnel file.

As to Deputy Young, to the extent counsel's declaration broadly sought materials that could be used to impeach Young or challenge his veracity, that request does not, in our view, meet the good cause standard outlined in *Warrick*, which requires that requests for information from police personnel records be narrowly tailored to the specific officer misconduct alleged in the declaration, and in turn that the alleged misconduct must support the defense proposed to the charges. (*Warrick*, *supra*, 35 Cal.4th at pp. 1024–1026.) Counsel's declaration here did not propose a specific defense to the charges, stating generally that Jones had pleaded not guilty and maintained his innocence. Jones now argues on appeal that the requested materials "would have bolstered the defense that appellant was misidentified" and would have supported a defense effort to exclude identifications that resulted from allegedly faulty lineup procedures, but the declaration that was submitted to the trial court did not make that argument. We cannot fault the court for not adopting it.

As to alleged misconduct by Young, the declaration stated generally that it would be Jones's position at trial that Young "conducted a lineup that was purposely suggestive" (without including details about how the lineup was improper, although some information on that point was included in the initial *Pitchess* motion). But the declaration focused principally on two allegedly false statements by Young, i.e., (1) Young's statement that Massaquoi positively identified Jones as the shooter in the July 28 photo lineup (which, at that point, Massaquoi claimed not to have done), and (2) Young's statement in a search warrant affidavit that Tackett saw Jones from outside her apartment, which was inconsistent with Tackett's

preliminary hearing testimony. At the hearing on the *Pitchess* motion, the court (like defense counsel) understandably focused on those alleged instances of misconduct, rather than on intentional suggestiveness in the lineup.

Young's allegedly false statement in a search warrant affidavit that Tackett went outside her apartment and saw Jones—whether intentionally false or, as the trial court believed more likely, the product of negligence— does not appear to be tethered to any claim about the adequacy of the lineup procedures used by Young. Similarly, the inconsistency between Young and Massaquoi about what was said at the July 28 lineup (i.e., whether Massaquoi positively identified Jones as the shooter) does not show the lineup procedures themselves were or were not faulty. In these circumstances, we conclude the court did not abuse its discretion by determining Jones had not made an adequate showing to compel in camera review. Jones did not present a "specific factual scenario of officer misconduct" that "supports [a] defense proposed to the charges." (*Warrick*, *supra*, 35 Cal.4th at pp. 1025–1026.)

Finally, although this information of course was not available to the trial court when it ruled on the pretrial *Pitchess* motion, we note that Young's allegedly false pretrial statements about Tackett's and Massaquoi's statements did not end up being the critical evidence on those points at trial, because Tackett and Massaquoi testified about the events in question. Tackett testified she was inside her apartment, looked out through the blinds, and saw Jones running. Massaquoi identified Jones at trial, and he testified he was confident in his identification of Jones at the July 28 lineup.

Because we conclude the court did not err in denying Jones's pretrial *Pitchess* motion, we also conclude the court did not abuse its discretion when

it denied Jones's motion for a new trial alleging in part that the pretrial *Pitchess* ruling was error. Jones's appellate argument that information developed during trial supported in camera review does not establish that the court's pretrial ruling was an error supporting a grant of a new trial.

Finally, we reject Jones's claim that his trial counsel provided ineffective assistance by failing to renew the *Pitchess* motion during trial. Jones notes that during trial, the parties stipulated that Massaquoi told a deputy district attorney that in the July 28 lineup he picked the person who "looked most like the suspect out of the six photos," but that he "was not very confident in his selection." The parties also stipulated that no police report indicated that Massaquoi told any officer he saw Jones on the night of the shooting, which was relevant because in the same search warrant affidavit that included Young's challenged statement about Tackett, Young arguably suggested incorrectly that Massaquoi knew the suspect's name or had identified Jones by name.

In our view, these developments, while perhaps bolstering Jones's ability to challenge Young's veracity generally, did not substantially strengthen his prospects of establishing good cause for in camera review of police personnel records under the standards outlined above in our discussion of the pretrial *Pitchess* motion. We cannot conclude that counsel, by not raising the *Pitchess* issue again during trial, rendered constitutionally deficient performance for purposes of an ineffective assistance of counsel claim. (See *Strickland v. Washington* (1984) 466 U.S. 668, 688 [defendant claiming ineffective assistance must show "counsel's representation fell below an objective standard of reasonableness"].)

## C. *The Need for a Remand for Resentencing*

Jones argues in his opening brief that we should remand for resentencing because two recent legislative enactments—Senate Bill No. 620

27

and Senate Bill No. 1393 (which took effect in 2018 and 2019, respectively)—confer discretion on the trial court to strike the firearm and prior serious felony enhancements it imposed at sentencing in 2020.[10]  In a supplemental brief, Jones contends a remand for resentencing is also necessary in light of more recent legislation that took effect on January 1, 2022, and modified applicable sentencing statutes, specifically sections 1170, subdivision (b), and 654.  The Attorney General agrees the latter set of legislative enactments—Senate Bill No. 567 and Assembly Bill No. 518—apply retroactively and that this court should remand for resentencing.

We conclude that, because of the postsentencing changes in the law effected by Senate Bill No. 567 (2021–2022 Reg. Sess.) (Senate Bill 567) and Assembly Bill No. 518 (2021–2022 Reg. Sess.) (Assembly Bill 518), a remand for a full resentencing is necessary.  At that resentencing, Jones may present arguments as to any sentencing issue, including as to whether the firearm and prior serious felony enhancements should be imposed.  We therefore need not address the parties' contentions as to whether the earlier enactments that specifically pertain to enhancements (Senate Bill 620 and Senate Bill 1393, both of which took effect before Jones was sentenced) would themselves provide a basis for a remand for resentencing.

---

[10] Senate Bill No. 620 (2017–2018 Reg. Sess.) (Senate Bill 620), which took effect on January 1, 2018, amended sections 12022.5 and 12022.53 to provide that a sentencing court has discretion to strike or dismiss the firearm enhancements authorized by those sections.  (§§ 12022.5, subd. (c), 12022.53, subd. (h); Stats. 2017, ch. 682, §§ 1, 2; see *People v. Woods* (2018) 19 Cal.App.5th 1080, 1090.)  Senate Bill No. 1393 (2017–2018 Reg. Sess.) (Senate Bill 1393) became effective a year later, on January 1, 2019, and amended sections 667, subdivision (a), and 1385, subdivision (b), to give a trial court the authority to strike or dismiss a prior serious felony enhancement.  (Stats. 2018, ch. 1013, §§ 1, 2; see *People v. Stamps* (2020) 9 Cal.5th 685, 702.)

Turning to the more recent legislation, Senate Bill 567 amended section 1170, subdivision (b), to specify that, when a sentencing court chooses a term from a statutory triad, the chosen term shall not exceed the middle term, unless the facts supporting the aggravating circumstances are (1) established by the defendant's stipulation to them, (2) proven to a jury (or to a court, if jury is waived) beyond a reasonable doubt, or (3) based on prior convictions evidenced by a certified record of conviction.  (Stats. 2021, ch. 731, §§ 1.3, 3(c), adding § 1170, subd. (b)(1)–(3), by amendment.)  Jones contends the court imposed the upper term for count 1 based on grounds that do not meet these requirements.  Senate Bill 567 also added a provision that requires the court to impose the low term if the defendant's psychological, physical, or childhood trauma was a contributing factor in the commission of the offense, "unless the court finds that the aggravating circumstances outweigh the mitigating circumstances [so] that imposition of the lower term would be contrary to the interests of justice."  (Stats. 2021, ch. 731, §§ 1.3, 3(c), adding § 1170, subd. (b)(6), by amendment.)[11]  As to this latter provision,

[11] The parties cite Assembly Bill No. 124 (2021–2022 Reg. Sess.) (Assembly Bill 124) as having amended Penal Code section 1170 to add this latter provision.  As we read the legislation, however, it is Senate Bill 567 that added subdivision (b)(6) to the statute.  (Stats. 2021, ch. 731, §§ 1.3, 3(c).)  Senate Bill 567, Assembly Bill 124, and one other bill (Assembly Bill No. 1540 (2021–2022 Reg. Sess.) (Assembly Bill 1540)), all of which were introduced in the first year of the 2021–2022 legislative term, proposed various changes to the Penal Code, including amendments to section 1170.  All three bills were passed by the Legislature in September 2021 and approved by the Governor on October 8, 2021.  (See Stats. 2021, ch. 695, § 5 [Assembly Bill 124], effective Jan. 1, 2022; Stats. 2021, ch. 719, § 2 [Assembly Bill 1540], effective Jan. 1, 2022; Stats. 2021, ch. 731, § 1.3 [Senate Bill 567], effective Jan. 1, 2022.)  The three bills overlapped in that they proposed similar but not identical amendments to section 1170.  But because Senate Bill 567 was the last bill signed by the Governor and bears the highest

Jones states in his supplemental brief that a probation report refers to statements by Jones that his father was charged with murdering his mother and that Jones dropped out of high school in 12th grade following her death.

Another recent enactment, Assembly Bill 518, amended section 654, subdivision (a), to provide in relevant part: "An act or omission that is punishable in different ways by different provisions of law may be punished under either of such provisions, but in no case shall the act or omission be punished under more than one provision." (Stats. 2021, ch. 441, § 1.) Previously, under section 654 "the sentencing court was required to impose the sentence that 'provides for the longest potential term of imprisonment' and stay execution of the other term. [Citation.] . . . [S]ection 654 now provides the trial court with discretion to impose and execute the sentence of either term, which could result in the trial court imposing and executing the shorter sentence rather than the longer sentence." (*People v. Mani* (2022) 74 Cal.App.5th 343, 379.)

The parties agree aspects of Jones's sentence are potentially affected by these amendments to sections 1170, subdivision (b), and 654. The court, applying the pre-Senate Bill 567 version of section 1170, subdivision (b), imposed the upper term for the count 1 attempted murder conviction and imposed (but stayed) middle terms for counts 5, 9, and 10. And, applying the pre-Assembly Bill 518 version of section 654, the court imposed and executed the term applicable to attempted murder, while imposing but staying the terms applicable to other counts of conviction.

---

chapter number, its amendments to section 1170 prevail over the amendments to that code section specified in the other two bills. (Gov. Code, § 9605, subd. (b); *In re Thierry S.* (1977) 19 Cal.3d 727, 738–739; *People v. Banner* (2022) 77 Cal.App.5th 226, 243, fn. 2 (conc. & dis. opn. of Detjen, Acting P. J.).)

We agree with the parties that Jones, whose convictions are not final, is entitled to retroactive application of the ameliorative changes effected by Senate Bill 567 and Assembly Bill 518. (*People v. Flores* (2022) 73 Cal.App.5th 1032, 1039 ["The People correctly concede the amended version of section 1170, subdivision (b) that became effective on January 1, 2022, applies retroactively in this case as an ameliorative change in the law applicable to all nonfinal convictions on appeal"]; *People v. Mani*, *supra*, 74 Cal.App.5th at p. 379 ["defendant is entitled to [the] ameliorative benefit" of Assembly Bill 518's amendment to section 654]; see *People v. Vieira* (2005) 35 Cal.4th 264, 305–306 [conviction is not final while appeal is pending].) Remand is therefore necessary for the court to resentence Jones under amended sections 1170, subdivision (b), and 654. (*Mani*, at p. 381; *Flores*, at p. 1039.)

The Attorney General, citing *People v. Buycks* (2018) 5 Cal.5th 857, 893, argues the resentencing should be a " ' "full resentencing as to all counts." ' " The full resentencing rule described in *Buycks* dictates that "when part of a sentence is stricken on review, on remand for resentencing 'a full resentencing as to all counts is appropriate, so the trial court can exercise its sentencing discretion in light of the changed circumstances.' " (*Buycks*, at p. 893; *People v. Lopez* (2020) 56 Cal.App.5th 835, 844–845, review granted Jan. 27, 2021, S265936; see *People v. Choi* (2021) 59 Cal.App.5th 753, 770 [full resentencing appropriate where certain enhancements were stricken]; *People v. Burbine* (2003) 106 Cal.App.4th 1250, 1259 [full resentencing appropriate after the reversal of one or more subordinate counts of a felony conviction].) The full resentencing rule also applies to a resentencing that occurs pursuant to the recall provisions of section 1170, subdivision (d), Proposition 36 (Gen. Elec. (Nov. 6, 2012)), or Proposition 47 (Gen. Elec.

(Nov. 4, 2014)). (*Buycks*, at p. 893.) A full resentencing may involve the trial court's revisiting such decisions as the selection of a principal term, whether to stay a sentence, whether to impose an upper, middle, or lower term, and whether to impose concurrent or consecutive sentences. (*People v. Valenzuela* (2019) 7 Cal.5th 415, 424–425.)

We agree with the Attorney General that a full resentencing is appropriate here. Although we are not reversing any of Jones's convictions or ruling that a portion of his sentence is invalid (and his sentence has not been recalled under the statutory provisions cited above), we conclude the need to apply amended sections 1170, subdivision (b), and 654 creates sufficiently " 'changed circumstances' " (*People v. Buycks, supra*, 5 Cal.5th at p. 893) to warrant a full resentencing. Application of the amended statutes will require the trial court, at a minimum, to reconsider which triad term to impose for certain counts of conviction and which terms to stay under section 654. (§§ 654, subd. (a), 1170, subd. (b)(1)–(3), (6).) As part of that process, the court should also be free to reconsider any other components of the aggregate sentence it crafted in early 2020, which in this case included multiple counts of conviction and multiple enhancements. (*People v. Ramirez* (2019) 35 Cal.App.5th 55, 64 [" 'When a case is remanded for resentencing by an appellate court, the trial court is entitled to consider the entire sentencing scheme' "]; see *People v. Burbine, supra*, 106 Cal.App.4th at pp. 1257–1258 [full resentencing appropriate given the " 'interlocking nature' " and "inherently integrated nature" of felony sentencing for a multiple-count conviction].) We will remand for a full resentencing.

## III. DISPOSITION

The convictions are affirmed.  The sentence is vacated, and the case is remanded for resentencing.  If, on resentencing, the court again imposes the five-year enhancement for a prior serious felony conviction, the abstract of judgment should reflect that enhancement was imposed under section 667, subdivision (a)(1), rather than under section 667.5, subdivision (b).

STREETER, Acting P. J.

WE CONCUR:

BROWN, J.
DESAUTELS, J.*

---

* Judge of the Superior Court of California, County of Alameda, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

Trial Court:  Superior Court of California, County of Alameda

Trial Judge:  Hon. Thomas C. Rogers

Counsel:  Law Offices of Shannon Chase and Shannon Chase,
        by appointment of the Court of Appeal Under the
        First District Appellate Project's Independent Case System,
        for Defendant and Appellant.

        Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant
        Attorney General, Jeffrey M. Laurence, Senior Assistant
        Attorney General, Bruce L. Ortega and René A. Chacón,
        Deputy Attorneys General, for Plaintiff and Respondent.